RECEIPT # _____
AMOUNT $ 150
SUMMONS ISSUED Y-Y
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK. _____
DATE 12-9-04

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SUSAN KATZ, Individually and On Behalf of All Others Similarly Situated, | ) ) ) **CIVIL ACTION NO.** |
| Plaintiff, | ) ) ) |
| vs. | ) **CLASS ACTION COMPLAINT** ) |
| PRAECIS PHARMACEUTICALS INC., MALCOLM GEFTER, KEVIN MCLAUGHLIN, EDWARD ENGLISH, AND WILLIAM K. HEIDEN, | ) ) ) ) **JURY TRIAL DEMANDED** |
| Defendants. | ) ) |

04 2581 GAO

MAGISTRATE JUDGE Bowler

Plaintiff, Susan Katz ("Plaintiff"), individually and on behalf of all other persons similarly

situated, by her undersigned attorneys, for her complaint against defendants, alleges the following

based upon personal knowledge as to herself and her own acts, and information and belief as to all

other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys,

which included, among other things, a review of the defendants' public documents, conference calls

and announcements made by defendants, United States Securities and Exchange Commission

("SEC") filings, wire and press releases published by and regarding Praecis Pharmaceuticals Inc.,

("Praecis" or the "Company") securities analysts' reports and advisories about the Company, and

information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support

will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal class action on behalf of persons who purchased or otherwise acquired the securities of Praecis between November 25, 2003 and December 6, 2004, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

4.      Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District. Additionally, the Company maintains a principal executive office in this Judicial District.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.    Plaintiff, Susan Katz, as set forth in the accompanying certification, incorporated by reference herein, purchased Praecis securities at artificially inflated prices during the Class Period and has been damaged thereby.

7.    Defendant Praecis is a Delaware corporation that maintains its principal place of business within this judicial district at 830 Winter Street, Waltham, MA 02451.

8.    Defendant Malcom Gefter ("Gefter") was, at all relevant times, the Company's Chairman and Chief Executive Officer.

9.    Defendant William K. Heiden ("Heiden") was, until his resignation on September 7, 2004, the Company's President and Chief Operating Officer.

10.    Defendant Kevin F. McLaughlin was, until his appointment on September 7, 2004, as the Company's President and Chief Operating Officer, the Company's Vice President and Chief Financial Officer.

11.    Defendant Edward C. English was, since his appointment on September 7, 2004, the Company's Chief Financial Officer and Treasurer of the Company.

12.    Defendants Gefter, Heiden, McLaughlin and English are collectively referred to hereinafter as the "Individual Defendants." During the Class Period, each of the Individual Defendants, as senior executive officers and/or directors of Praecis were privy to non-public information concerning its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

-3-

Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

13.    Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

14.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers of Praecis, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

-4-

15.    As officers and controlling persons of a publicly-held company whose securities were and are registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate accurate and truthful information promptly with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

16.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Praecis, each of the Individual Defendants had access to the adverse undisclosed information about Praecis financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Praecis and its business issued or adopted by the Company materially false and misleading.

17.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.

-5-

Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

18.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Praecis securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme (i) deceived the investing public regarding Praecis business, operations, management and the intrinsic value of Praecis securities; and (ii) caused Plaintiff and other members of the Class to purchase Praecis securities at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

19.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of Praecis between November 25, 2003 and December 6, 2004, inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

20.     The members of the Class are so numerous that joinder of all members is imprac-ticable. Throughout the Class Period, Praecis' securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be

ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Praecis or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

21.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

22.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

23.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)  whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)  whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Praecis; and

(c)  to what extent the members of the Class have sustained damages and the proper measure of damages.

24.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background

25.    Praecis is a biopharmaceutical company focused on the discovery and development of therapies to address unmet medical needs. The Company's first United States Food and Drug Administration ("FDA") approved product is Plenaxis (abarelix for injectable suspension), which is a treatment for advanced symptomatic prostate cancer in men. The Company has initiated the regulatory review process for the product in the European Union with a submission in Germany. Praecis is also in discussions with potential partners for the commercialization of Plenaxis in Japan and other parts of the world. The Company is also developing Apan, an investigational drug candidate for the treatment of Alzheimer's disease.

### Materially False And Misleading
### Statements Issued During The Class Period

26.    The Class Period commences on November 25, 2003. At that time, Praecis announced that the FDA had approved its lead product, Plenaxis. For safety reasons, Plenaxis was approved with marketing restrictions under 21 CFR 314, Subpart H, and would be available only to physicians who enroll in the PLUS ("PLenaxis(TM) User Safety") Program. With respect to the Plus Program, the Company stated:

> PLUS Program
>
> The Plenaxis(TM) risk management program approved by the FDA includes, among other elements:

-- Product labeling regarding the risk of immediate-onset systemic allergic reactions and the decreased effectiveness of Plenaxis(TM) in suppressing serum testosterone to castrate levels with continued dosing in some patients;

-- An agreement for physicians which must be signed in order to become a prescriber of the drug;

-- An agreement for hospital pharmacists confirming their participation in the program and the actions required prior to dispensing the drug;

-- A patient information form which patients sign, indicating that they are informed about the risks and benefits of the drug;

- A program for reporting adverse events, including immediate-onset systemic allergic reactions (anaphylaxis, hypotension (lowering of the blood pressure) and/or syncope (fainting)) to the Company and the FDA; and

-- Measures to actively monitor and evaluate the program.

27.    Commenting on the approval defendant Gefter stated:

We are delighted with the approval, and would like to thank the FDA for diligently working with us to make this drug available for those prostate cancer patients who are most in need. The approval of Plenaxis(TM) represents years of dedication to drug discovery and development at PRAECIS to bring an innovative product to the market and marks an important milestone in our transition to a fully integrated pharmaceutical company. More importantly, this approval will bring a valuable therapy to those patients in the indicated population who have limited or no other treatment options available.

28.    Furthermore, defendant Heiden added:

The launch of Plenaxis(TM) will be supported by the PLUS Program, which is designed with the goal of providing the benefits of enhanced safety for patients taking Plenaxis(TM), as well as education and support for prescribing physicians and dispensing hospital pharmacists. The PLUS Program represents an ongoing effort by the FDA and industry to identify and successfully manage the potential

risks of new therapies, while ensuring that these important therapies are available to patients who will most benefit from them.

***

The PLUS Program highlights that patient safety is our number one priority[.]...With this program in place, we are now able to direct this therapy into the hands of physicians to treat those patients for whom the benefits of Plenaxis(TM) outweigh the potential risks. In addition, we plan to begin working with the FDA to explore other patient populations which could be appropriately treated with Plenaxis(TM) in the future.

***

We are extremely excited about the launch of our first product and the revenue opportunity it represents. We will begin hiring the Plenaxis(TM) sales force immediately, with initial product shipment targeted for early in the first quarter of 2004.

29.    On January 30, 2004, Praecis announced consolidated financial results for the three months and year ended December 31, 2003. The Company reiterated its objective to obtain profitability driven by sales of Plenaxis by 2006. For the year ended December 31, 2003, the Company's cash utilization was approximately $51,843,000. The Company's net loss for the three months ended December 31, 2003 was approximately $16,048,000, or $0.31 per diluted share, compared to a net loss of approximately $13,605,000, or $0.26 per diluted share, for the three months ended December 31, 2002. For the year ended December 31, 2003, net loss was approximately $55,798,000, or $1.08 per diluted share, compared to a net loss of approximately $46,075,000, or $0.89 per diluted share, for the year ended December 31, 2002. Commenting on these results, defendant Gefter stated:

> The past year was one of significant accomplishment for PRAECIS. In November, we achieved our primary goal for 2003 with the receipt of approval from the United States Food and Drug Administration

(FDA) to market Plenaxis(TM) in the United States. **This approval marks our transition to a fully integrated pharmaceutical company with capabilities spanning drug discovery, clinical development, manufacturing and commercialization.** The approval of Plenaxis(TM) also validates our scientific approach of using proprietary technologies to maximize the success of selecting drug candidates for development and commercialization, thereby minimizing high rates of failure. These technologies enable our scientists to conduct a battery of tests to determine the most appropriate drug candidates for advancement into clinical development. This approach was utilized in selecting Plenaxis(TM) and Apan, our compound for the treatment of Alzheimer's disease, for development, and we intend to use these technologies when selecting future development candidates. **We believe that the approval of Plenaxis(TM) confirms our team's ability to translate innovative scientific discoveries into commercial reality, effectively and efficiently.**

(Emphasis added.)

30.    With respect to commercialization of Plenaxis, the Company stated:

With regard to the commercialization efforts for Plenaxis(TM), the Company has begun shipping product to distributors. Since receipt of FDA approval for Plenaxis(TM) in late November 2003, the Company has hired and trained its medical science liaisons and its regional sales managers, and is aggressively hiring and training its estimated 40 field sales representatives. The Company is currently launching a variety of important marketing initiatives and is leveraging its key opinion leader support through a host of educational programs in the United States.

"We are extremely pleased to announce that Plenaxis(TM) is now available through our authorized distributors to physicians and hospital pharmacies enrolled in the Plenaxis(TM) User Safety (PLUS) Program," stated William K. Heiden, PRAECIS' President and Chief Operating Officer. "Our goal is to have 100% of our sales force hired, trained and in the field by early in the second quarter of 2004. With an expected average of 6-8 years of experience, our well-seasoned field force will provide urologists and oncologists with significant insight into this new treatment for advanced symptomatic prostate cancer."

-11-

Commenting on the significant impact of this approval on PRAECIS' business, Mr. Heiden continued, "**The approval of Plenaxis(TM) is enabling us to build a commercialization infrastructure that adds tremendous value to our organization.** We can leverage this infrastructure to position ourselves as a partner of choice for commercializing other urology/oncology products, advance our future products and maintain greater control when evaluating partnership opportunities for our clinical stage products."

The Company is continuing to evaluate the potential utility of Plenaxis(TM) in other indications to further exploit its unique mechanism of action. As part of this process, the Company has established several groups of experienced clinical advisors and continues to work closely with these groups of experts to identify indications where the use of Plenaxis(TM) may provide innovative advantages compared to existing therapies.
(Emphasis Added.)

31.    With respect to its 2004 financial guidance, the Company stated:

The Company believes that it has adequate financial resources to achieve profitability by 2006, assuming the successful commercialization of Plenaxis(TM), the timely partnering of clinical programs and continued prudent fiscal management. **During 2004, the Company forecasts sales of Plenaxis(TM) to range from $10.0 million to $20.0 million and anticipates the ramp-up of revenues to be heavily weighted toward the second half of the year.** The Company anticipates updating its financial guidance throughout 2004, as it gains a greater insight into Plenaxis(TM)' revenue trajectory.

**With respect to the future prospects for Plenaxis(TM), the market for currently available hormonal therapies to treat prostate cancer is approximately $1.2 billion in the United States. The Company believes that the long-term revenue opportunity for Plenaxis(TM) may represent 15% or more of this market.**

32.    On March 15, 2004, Praecis filed its annual report with the SEC on Form 10-K. The Company's annual report was signed by defendant McLaughlin and reaffirmed its previously announced financial results.

-12-

33.    On March 31, 2004, Praecis announced it had been informed by The Centers for

Medicare & Medicaid Services ("CMS") that Plenaxis had qualified for transitional pass-through

payment under the Medicare hospital outpatient prospective payment system ("HOPPS").  More

specifically, the Company stated:

> PRAECIS greatly appreciates the diligent efforts of CMS in reaching
> this determination in such an expeditious manner for this important
> new product," stated William K. Heiden, PRAECIS' President and
> Chief Operating Officer.
>
> ***
>
> Continuing, Mr. Heiden stated, **"We are especially pleased to
> receive this news now, as initial interest in Plenaxis(TM) has been
> very encouraging, with over 1,000 physicians and hospital
> pharmacies having enrolled in our PLUS (PLenaxis(TM) User
> Safety) Program to date."**
> (Emphasis Added.)

34.    On May 10, 2004, Praecis filed its quarterly report with the SEC on Form 10-Q.  The

Company's Form 10-Q was signed by defendant McLaughlin and reaffirmed Praecis' previously

announced financial results.

35.    On April 30, 2004, Praecis provided an update on the commercialization of Plenaxis

in the United States and announced consolidated financial results for the three months ended March

31, 2004.  The Company's net loss for the three months ended March 31, 2004 was approximately

$15,380,000, or $0.29 per diluted share, compared to a net loss of approximately $11,415,000, or

$0.22 per diluted share, for the three months ended March 31, 2003.  Cost of goods sold for the three

months ended March 31, 2004 was approximately $1.1 million, $1.0 million of which was related

to a milestone payment due upon the first commercial sale of Plenaxis(TM).  Sales and marketing

expenses for the three months ended March 31, 2004 increased to approximately $4.1 million, from

approximately $1.0 million for the corresponding period in 2003, due to the hiring of a sales force and various launch-related activities, including market research, brand development and the creation of initial marketing materials. With respect to the commercialization of Plenaxis, the Company stated:

> In late January 2004, the Company launched its lead product, Plenaxis(TM), for the treatment of a defined subset of advanced symptomatic prostate cancer patients. During the first quarter of 2004, the Company focused on building its commercial infrastructure to support the launch of Plenaxis(TM) in the United States. Field sales representatives were hired and trained during the first quarter and began calling on potential customers to build product awareness, enroll physicians and hospital pharmacies in the Plenaxis(TM) User Safety (PLUS) Program and generate product sales. In order to ensure that Plenaxis(TM) is widely available to prescribing physicians, the Company has established a network of premier specialty distributors, including: Cardinal Health, CuraScript Pharmacy, Inc., McKesson Specialty Distribution Services, Oncology Therapeutics Network and Priority Healthcare Corporation. During the first quarter, these distributors began shipping product to physicians and hospital pharmacies enrolled in the PLUS Program, and patients are now being treated with Plenaxis(TM).
>
> **The Company generated net revenue of approximately $0.4 million through sales to distributors, representing primarily initial stocking levels. Based upon the first quarter activity, the Company's prior Plenaxis(TM) sales forecast of $10.0 million to $20.0 million in revenue for 2004 remains unchanged.**
>
> As of the date of this release, the Company has hired all of its 40 field sales representatives. The initial impact of the Plenaxis(TM) sales force can be seen in the large number of physicians who have signed up to become authorized Plenaxis(TM) prescribers by enrolling in the PLUS Program. Currently, approximately 1,900 physicians and hospital pharmacies have enrolled in the PLUS Program.

***

***

-14-

36.    Commenting on the first quarter results, defendant Gefter stated:

**"During the first quarter of 2004, PRAECIS continued to capitalize on the Plenaxis(TM) commercial opportunity. Although it is early in the Plenaxis(TM) launch, we are encouraged by the feedback from physicians and expect to build sales during the second half of the year as awareness of the product grows among urologists and oncologists.** (Emphasis Added.)

37.    On July 30, 2004, Praecis announced consolidated financial results for the three and six months ended June 30, 2004. The Company's net loss for the three months ended June 30, 2004 was approximately $14,842,000, or $0.28 per diluted share, compared to a net loss of approximately $15,550,000, or $0.30 per diluted share, for the three months ended June 30, 2003. Total revenues during the second quarter of 2004 were approximately $673,000, compared to zero for the corresponding period in 2003. Sales of Plenaxis(R) in the second quarter of 2004 were $645,000. For the six months ended June 30, 2004, net loss was approximately $30,222,000, or $0.58 per diluted share, compared to a net loss of approximately $26,965,000, or $0.52 per diluted share, for the six months ended June 30, 2003. Total revenues for the first six months of 2004 were approximately $1,134,000, including approximately $1,056,000 in sales of Plenaxis(R), compared to zero for the corresponding period in 2003. At June 30, 2004, the Company had cash, cash equivalents and marketable securities of approximately $111,458,000, compared to approximately $143,192,000 at December 31, 2003.

38.    With respect to Plenaxis, the Company stated:

Plenaxis(R) Update

In late January 2004, the Company launched its lead product, Plenaxis(R), for the treatment of a defined subset of advanced symptomatic prostate cancer patients. During the first half of 2004,

-15-

the Company focused on launching Plenaxis(R) by building a full commercial infrastructure. Included within this build-up was the hiring and training of a field sales force of approximately 40 individuals as well as the establishment of the Plenaxis(R) User Safety (PLUS) Program. Physicians who intend to prescribe Plenaxis(R) must first enroll in the PLUS Program. All of the field force has been hired, trained and is now calling on physicians and, as of today, the Company has enrolled approximately 3,000 physicians in the PLUS Program, with more than 10% having already purchased Plenaxis(R).

**"Given our success in enrolling a large number of physicians in our PLUS Program, we have begun to shift our focus,"** stated William K. Heiden, the Company's President and Chief Operating Officer. **"While educating new physicians and enrolling them in the PLUS Program will be important to the long-term success of Plenaxis(R), our current efforts in the field are focused principally towards assisting PLUS-enrolled physicians to take the next step and become Plenaxis(R) prescribers. We have seen evidence of the success of this strategy in a trend of increasing weekly sales which began in the latter portion of the second quarter. We expect to see Plenaxis(R) sales continue to build quarter on quarter over the course of the year."**

Longer-term, the Company continues to believe that the revenue opportunity for Plenaxis(R) may represent 15% or more of the $1.2 billion hormone therapy market for prostate cancer in the United States.

39.    On August 9, 2004, Praecis filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendant McLaughlin and reaffirmed Praecis' previously announced financial results.

40.    On October 26, 2004, Praecis announced consolidated financial results for the three and nine months ended September 30, 2004. The Company's net loss for the three months ended September 30, 2004 was approximately $13,954,000, or $0.27 per diluted share, compared to a net loss of approximately $12,785,000, or $0.25 per diluted share, for the three months ended September

30, 2003. Total revenues during the third quarter of 2004 were approximately $1,074,000, compared to zero for the corresponding period in 2003. Sales of Plenaxis(R) in the third quarter of 2004 were $1,032,000. The increased net loss for the three months ended September 30, 2004, compared to the three months ended September 30, 2003, was due to a significant increase in sales and marketing expenses resulting from the hiring of the field force and the establishment of the commercial infrastructure to support the launch of Plenaxis(R) in the United States. For the nine months ended September 30, 2004, net loss was approximately $44,176,000, or $0.84 per diluted share, compared to a net loss of approximately $39,750,000, or $0.77 per diluted share, for the nine months ended September 30, 2003. Total revenues for the first nine months of 2004 were approximately $2,208,000, including approximately $2,088,000 in sales of Plenaxis(R), compared to zero for the corresponding period in 2003. Commenting on the results, defendant Gefter stated:

> During the past several months, the Company has gained considerable experience in marketing Plenaxis(R), has undergone significant changes to improve its senior management team and has continued to advance its development and discovery technologies. As we look forward, we expect to begin new clinical trials related to our PPI-2458 and Apan clinical development programs. We further expect that our Direct Select(TM) technology platform will continue to expand in its scope and value as we look to partner this unique discovery capability. All of these changes should positively impact our future as a fully integrated biopharmaceutical organization and we are looking forward to a productive fourth quarter and 2005.

41.    With respect to Plenaxis, the Company stated:

> In late January 2004, the Company launched its lead product, Plenaxis(R), for the treatment of a defined subset of advanced symptomatic prostate cancer patients. During the first half of 2004, the Company focused on launching Plenaxis(R) by building a commercial infrastructure. Included within this build-up was the hiring and training of a field sales force of approximately 40 individuals as well as the establishment of the Plenaxis(R) User

Safety (PLUS) Program. Physicians who intend to prescribe Plenaxis(R) must first enroll in the PLUS Program. As of today, the Company has enrolled approximately 3,400 physicians (and hospital pharmacies) in the PLUS Program, with more than 15% of enrolled physicians having already purchased Plenaxis(R), compared to approximately 10% of enrolled physicians at the end of the second quarter. Approximately half of physicians who have purchased Plenaxis(R) have already become repeat prescribers. Using the experience gained during the first nine months of launch, the Company will now focus on improving its messaging regarding both the unique attributes of Plenaxis(R) and the specific patients for whom Plenaxis(R) is appropriate, with a view to building on this growing base of prescribers.

Commenting on the Company's commercialization efforts, Kevin F. McLaughlin, the Company's recently appointed President and Chief Operating Officer, stated, "**We are encouraged by the growing base of sales to repeat prescribers. This trend suggests that following their first experience with Plenaxis(R), physicians are pleased with the results and thus are continuing to treat existing patients with, and identify new patients for, Plenaxis(R) therapy.** Accordingly, we expect to see Plenaxis(R) sales continue to build quarter on quarter. We recognize that our sales and marketing organization has faced many challenges, both expected and unexpected, in introducing Plenaxis(R) to the marketplace. These challenges include the need to clearly differentiate, and educate physicians on, the indicated patient population. We believe our ability to meet these challenges has been substantially enhanced by our recently announced hiring of Michael J. Keavany as Senior Vice President, Sales and Marketing, to lead the Plenaxis(R) commercialization efforts. Mr. Keavany's strong background in marketing specialty products will be invaluable towards meeting our commitment of making Plenaxis(R) a commercial success."

42.    The statements contained in ¶¶ 26-41 were materially false and misleading when made because defendants failed to disclose or indicate the following: (1) that the distribution of the Company's flagship drug, Plenaxis, had been severely restricted by the FDA, which significantly reduced the potential market for the therapy; (2) that the Company failed to establish effective messaging to educate physicians about the product's indication and the appropriate patient

-18-

population; (3) that the Company, despite impressive enrollment numbers in the PLUS program, had

difficulties convincing physicians to prescribe the product due to uncertainty over use and concerns

over reimbursement; (4) that the Company lacked adequate internal control and (5) that as a result

of the above, the defendants' fiscal 2004 projections were lacking in any reasonable basis when

made.

## The Truth Begins To Emerge

43.    On December 6, 2004, Praecis provided an update on the Company's

commercialization of Plenaxis in the United States. More specifically, the Company, in its press

release stated:

> The Company stated that Plenaxis(R) is an important therapy for
> patients in the indicated population who have limited or no other
> treatment options available and reported that physician feedback
> reaffirms that Plenaxis(R) achieves its intended therapeutic goal of
> providing these patients with a non-surgical option for managing the
> symptoms of their advanced prostate cancer.
>
> However, as previously reported, since the initial launch of
> Plenaxis(R), the Company has faced many challenges that have had
> an adverse impact on the uptake of the product in the market. These
> challenges have included the need to achieve sales force efficiency,
> establish more effective messaging to educate physicians about the
> product's indication and the appropriate patient population, and
> overcome physician uncertainty and concerns over reimbursement.
> More specifically, the Company has found that educating physicians
> about the Plenaxis(R) User Safety (PLUS) Program and the
> appropriate patient population for Plenaxis(R) has markedly increased
> the sales cycle and requires a very focused sales message and sales
> call. In addition, physicians' concerns over obtaining reimbursement
> coverage for Plenaxis(R) during the initial launch phase have been
> compounded this quarter by increasing physician uncertainty
> regarding the impact of changing pharmaceutical reimbursement for
> 2005 as a result of recent Medicare reform. The impact of these
> challenges has negatively affected Plenaxis(R) sales, and therefore,
> the Company now expects sales to decrease from the third to the

fourth quarter of 2004. Despite this shortfall, the Company continues to expect to end the year with cash, cash equivalents and marketable securities of at least $75.0 million.

\*\*\*

The Company believes that its re-launch of Plenaxis(R) will enable it to capitalize on the product's long term potential. During this re-launch period in the U.S. market, and while the Company awaits approval of its marketing application for Plenaxis(R) in Germany (and then additional European countries), **the Company has decided to remove its previous short and long term sales and earnings guidance, and does not currently anticipate providing further guidance until a consistent trend for Plenaxis(R) sales emerges.** (Emphasis Added.)

44.    News of this shocked the market.  Shares of Praecis fell $.56 per share, or 25.8 percent on December 6, 2004, to close at $1.61 per share.

## UNDISCLOSED ADVERSE FACTS

45.    The market for Praecis' securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Praecis' securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Praecis securities relying upon the integrity of the market price of Praecis' securities and market information relating to Praecis, and have been damaged thereby.

46.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of Praecis' securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that

-20-

they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

47.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Praecis' business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Praecis and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

### ADDITIONAL SCIENTER ALLEGATIONS

48.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Praecis, their control over, and/or receipt and/or modification of Praecis allegedly materially misleading misstatements and/or their associations with

-21-

the Company which made them privy to confidential proprietary information concerning Praecis, participated in the fraudulent scheme alleged herein.

49.    Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

50.    During the Class Period and with the Company's stock trading at an inflated price defendant Gefter sold 600,000 shares for proceeds of $4,146,000.

**Applicability Of Presumption Of Reliance:**
**Fraud-On-The-Market Doctrine**

51.    At all relevant times, the market for Praecis securities was an efficient market for the following reasons, among others:

(a) Praecis stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Praecis filed periodic public reports with the SEC and the NASDAQ;

(c) Praecis regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Praecis was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

52.    As a result of the foregoing, the market for Praecis securities promptly digested current information regarding Praecis from all publicly-available sources and reflected such information in Praecis' stock price. Under these circumstances, all purchasers of Praecis securities during the Class Period suffered similar injury through their purchase of Praecis securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

53.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Praecis who knew that those statements were false when made.

-23-

**FIRST CLAIM**
**Violation Of Section 10(b) Of**
**The Exchange Act Against And Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

54.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

55.     During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Praecis securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

56.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Praecis securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

57.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Praecis as specified herein.

-24-

58.     These defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Praecis value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Praecis and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Praecis securities during the Class Period.

59.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

60.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Praecis operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

61.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Praecis securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Praecis publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired Praecis securities during the Class Period at artificially high prices and were damaged thereby.

62.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Praecis was

-26-

experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class

would not have purchased or otherwise acquired their Praecis securities, or, if they had acquired such

securities during the Class Period, they would not have done so at the artificially inflated prices

which they paid.

63.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange

Act, and Rule 10b-5 promulgated thereunder.

64.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the

other members of the Class suffered damages in connection with their respective purchases and sales

of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation Of Section 20(a) Of**
**The Exchange Act Against the Individual Defendants**

65.    Plaintiff repeats and realleges each and every allegation contained above as if fully

set forth herein.

66.    The Individual Defendants acted as controlling persons of Praecis within the meaning

of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and

their ownership and contractual rights, participation in and/or awareness of the Company's

operations and/or intimate knowledge of the false financial statements filed by the Company with

the SEC and disseminated to the investing public, the Individual Defendants had the power to

influence and control and did influence and control, directly or indirectly, the decision-making of

the Company, including the content and dissemination of the various statements which Plaintiff

contend are false and misleading. The Individual Defendants were provided with or had unlimited

access to copies of the Company's reports, press releases, public filings and other statements alleged

by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

67.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

68.     As set forth above, Praecis and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

-28-

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: December 9, 2004

By her attorneys,

**SHAPIRO HABER & URMY LLP**

**/s/Theodore M. Hess-Mahan**
Theodore M. Hess-Mahan BBO No. 557109
53 State Street
Boston, MA 02109
(617) 439-3939

**SCHIFFRIN & BARROWAY, LLP**
Marc A. Topaz, Esquire
Richard A. Maniskas, Esquire
Tamara Skvirsky, Esquire
Three Bala Plaza East
Suite 400
Bala Cynwyd, PA 19004
(610) 667-7706

**Attorneys for Plaintiff**

-30-

**℆JS 44** (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
SUSAN KATZ

## DEFENDANTS
PRAECIS PHARMACEUTICALS INC., MALCOM GEFTER, KEVIN McLAUGHLIN, EDWARD ENGLISH and WILLIAM k. HEIDEN

**(b)** County of Residence of First Listed Plaintiff    OUT OF STATE
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Theodore M. Hess-Mahan        Tel: (617) 439-3939
Shapiro Haber & Urmy LLP      Fax: (617) 439-0134
53 State Street
Boston, MA 02109

Attorneys (If Known)

## 04    12581 GAO

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- X 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                          and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury | of Property 21 USC 881 | 28 USC 157 | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 820 Copyrights | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 830 Patent | ☐ 810 Selective Service |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | ☐ 840 Trademark | X 850 Securities/Commodities/ |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | Exchange |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | | ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | **SOCIAL SECURITY** | 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| | | | ☐ 730 Labor/Mgmt.Reporting | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | & Disclosure Act | | Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | | ☐ 870 Taxes (U.S. Plaintiff | Determination Under |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | or Defendant) | Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. | 26 USC 7609 | State Statutes |
| | | ☐ 550 Civil Rights | Security Act | | ☐ 890 Other Statutory Actions |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- X 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
(Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
15 USC §§78j(b) and 78t(a) and 17 CFR 240.10b-5

## VII. REQUESTED IN COMPLAINT:
X CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

**DEMAND $** 0

CHECK YES only if demanded in complaint:
**JURY DEMAND:** X Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):  JUDGE _____    DOCKET NUMBER _____

DATE   12/9/2004

SIGNATURE OF ATTORNEY OF RECORD
*Theodore M. Hess-Mahan*

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only) Susan Katz v. Praecis Pharmaceuticals Inc, et al.

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.

(See local rule 40.1(a)(1)).

___   I.   160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

_X_   II.  195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730, *Also complete AO 120 or AO 121
           740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950. for patent, trademark or copyright cases

___   III. 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
           315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
           380, 385, 450, 891.

___   IV.  220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
           690, 810, 861-865, 870, 871, 875, 900.

___   V.   150, 152, 153.

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed
   in this district please indicate the title and number of the first filed case in this court.

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

                                                      YES ☐      NO **X**

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?
   (See 28 USC §2403)
                                                      YES ☐      NO **X**

   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

                                                      YES ☐      NO **X**

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

                                                      YES ☐      NO **X**

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of
   Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local
   Rule 40.1(d)).
                                                      YES **X**    NO ☐

   A.   If yes, in which division do all of the non-governmental parties reside?

        Eastern Division  **X**        Central Division ☐            Western Division ☐

   B.   If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental
        agencies, residing in Massachusetts reside?

        Eastern Division ☐            Central Division ☐            Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court?
   (If yes, submit a separate sheet identifying the motions)

                                                      YES ☐      NO ☐

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME Theodore M. Hess-Mahan

ADDRESS Shapiro Haber & Urmy LLP, 53 State Street, Boston, MA 2109

TELEPHONE NO. (617) 439-3939

(CategoryForm.wpd - 10/17/02)