# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

IN RE PRAECIS PHARMACEUTICALS, INC.
SECURITIES LITIGATION

Civil Action No. 04-12581 GAO

## LEAD PLAINTIFFS' SUBMISSION OF SUPPLEMENTAL AUTHORITY
## (LEAVE TO FILE GRANTED ON NOVEMBER 7, 2006)

Pursuant to Local Rule 7.1 (B)(3), Lead Plaintiffs, Kellie Seringer, the City of

Dearborn Heights Police and Fire Retirement System, George Ladikos and Edward G. Bourne,

respectfully submit as supplemental authority in opposition to defendants' Motion to Dismiss,

three recent decisions on motions to dismiss from similar cases:  *In re StockerYale Sec. Litig*,

___ F. Supp. 2d ___, 2006 WL 2772581 (D.N.H. Sept. 27, 2006) (copy submitted herewith as

Exhibit A); *Alvarado v. Morgan Stanley Dean Witter, Inc.*, ____ F. Supp. 2d ____, 2006 WL

2587496 (D. P.R. Aug. 30, 2006) (copy submitted herewith as Exhibit B); and  *Rosenbaum

Capital LLC v. Boston Communications Group, Inc.*, 445 F. Supp. 2d 170 (D. Mass. Aug. 20,

2006) (copy submitted herewith as Exhibit C).

Lead Plaintiffs submit *StockerYale*, to support two of their arguments:

(i) a forward looking statement (or any statement of opinion) made without a reasonable

basis in fact, is actionable, and that reckless disregard of the truth in connection with the

statement is sufficient (*id*,. at *11); and

(ii)  contrary to defendants' assertion, Lead Plaintiffs are not required to plead culpable

conduct or scienter in connection with a claim under section 20(a) of the Securities and

Exchange Act of 1934 (the "1934 Act").  *Id.*, at *15.

Similarly, Lead Plaintiffs submit *Alvarado* to show that "Section 20(a) does not obligate

plaintiffs to plead or prove scienter." *Id.* at \*5.

Lead Plaintiffs submit *Rosenbaum Capital* for the following propositions:

(i) "'[I]f a plaintiff adequately pleads that a statement of opinion was subjectively false when made, the complaint will, *ex proprio vigure*, satisfy the pleading requirements of the PSLRA relative to scienter.'" 445 F. Supp. 2d at 175 (quoting *In re Credit Suisse First Boston Corp.*, 431 F.3d 36, 48 (1st Cir. 2005)); and (ii) that statements which are neither vague nor unclear, are not puffery. *Id.*, at 176.

By Order dated November 7, 2006, this Court granted Plaintiffs' motion for leave to submit this supplemental authority.

WHEREFORE, plaintiffs respectfully submit these decisions as supplemental authority.

Dated:  November 8, 2006                Respectfully submitted,

**GILMAN AND PASTOR, LLP**

 /s/ David Pastor
David Pastor
John C. Martland
225 Franklin Street, 16th Floor
Boston, MA 02110
Telephone:    (617) 742-9700
Facsimile:    (617) 742-9701

*Liaison Counsel for Plaintiffs*

**MURRAY, FRANK & SAILER LLP**
Lawrence D. McCabe
275 Madison Avenue, Suite 801
New York, New York 10016
Telephone:    (212) 682-1818
Facsimile:    (212) 682-1892

**GLANCY, BINKOW & GOLDBERG LLP**
Lionel Z. Glancy
Michael Goldberg
Peter A. Binkow
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067
Phone: (310) 201-9150
Fax: (310) 201-9160

*Co-Lead Counsel for the Plaintiffs*

<u>Certificate of Service</u>

I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)
and paper copies will be sent to those indicated as non-registered participants on November 8,
2006.

<u>/s/ David Pastor</u>

Exhibit A

Westlaw.

--- F.Supp.2d ----

Page 1

--- F.Supp.2d ----, 2006 WL 2772581 (D.N.H.), 2006 DNH 109
**(Cite as: --- F.Supp.2d ----)**

Briefs and Other Related Documents
In re StockerYaleD.N.H.,2006.
United States District Court,D. New Hampshire.
In re STOCKERYALE SECURITIES
LITIGATION
**No. CIV. 05-CV-177-SM.**

Sept. 27, 2006.

**Background:** Investors sued manufacturer of lasers, and specified officers and directors, alleging that manufacturer deceptively increased value of stock through misleading press releases overemphasizing importance of laser sales to potential developer of civilian aircraft missile defense system, sought by Department of Homeland Security. Manufacturer moved to dismiss.

**Holdings:** The District Court, McAuliffe, J., held that:

(1) claim was stated that manufacturer made misleading declaration that it was providing lasers for civilian aircraft antimissile systems;

(2) claim was stated that second press release failed to correct misleading elements of first release;

(3) scienter pleading requirement was satisfied;

(4) claim was stated that causal relationship existed between misleading claims and increase in value of stock; and

(5) claims of control person liability were stated against chief executive officer (CEO), chief financial officer (CFO), and chief operating officer (COO).

Motion denied.

**[1] Federal Civil Procedure 170A ⟨⟩1832**

170A Federal Civil Procedure
   170AXI Dismissal
      170AXI(B) Involuntary Dismissal
         170AXI(B)5 Proceedings
            170Ak1827 Determination
               170Ak1832 k. Matters Considered
in General. Most Cited Cases
Exhibits and factual allegations, regarding security services industry, would be stricken from legal memorandum supporting motion to dismiss securities fraud suit against provider of lasers and its executives; items had nothing to do with subject matter of present case.

**[2] Securities Regulation 349B ⟨⟩60.28(1)**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.17 Manipulative, Deceptive
or Fraudulent Conduct
               349Bk60.28 Nondisclosure; Insider
Trading
                  349Bk60.28(1) k. In General.
Most Cited Cases
The disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

**[3] Securities Regulation 349B ⟨⟩60.27(7)**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.17 Manipulative, Deceptive
or Fraudulent Conduct
               349Bk60.27 Misrepresentation
                  349Bk60.27(7) k. Statements in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2006 WL 2772581 (D.N.H.), 2006 DNH 109
(Cite as: --- F.Supp.2d ----)

the Media, Press Releases and Financial Reporting Services. Most Cited Cases

Investors stated claim that manufacturer of lasers, being sued under § 10(b), made misleading statement when it announced in press release that it was developing customized laser for development of missile countermeasure system for commercial planes under recent contract from customer; while statement was literally true, press release went on to state that customer had contract with Department of Homeland Security, to explore feasibility of converting military aircraft security systems for commercial use, creating inference that manufacturer's contract with customer was related to homeland security contract, and there was evidence manufacturer was aware that its contract was not related to buyer's homeland security project. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

**[4] Securities Regulation 349B ⬤══60.27(7)**

349B Securities Regulation
  349BI Federal Regulation
    349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation
        349Bk60.17 Manipulative, Deceptive or Fraudulent Conduct
          349Bk60.27 Misrepresentation
            349Bk60.27(7) k. Statements in the Media, Press Releases and Financial Reporting Services. Most Cited Cases

Investors stated claim that manufacturer of lasers violated § 10(b) by press release statement, that contract under which manufacturer was to supply lasers for buyer's system protecting military aircraft from missiles had resulted in orders related to buyer's new products providing missile protection to civilian aircraft, failed to correct earlier misrepresentation implying nonexistent connection between order for lasers and buyer's civilian aircraft protection work. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

**[5] Securities Regulation 349B ⬤══60.45(1)**

349B Securities Regulation
  349BI Federal Regulation
    349BI(C) Trading and Markets

349BI(C)7 Fraud and Manipulation
    349Bk60.43 Grounds of and Defenses to Liability
      349Bk60.45 Scienter, Intent, Knowledge, Negligence or Recklessness
        349Bk60.45(1) k. In General. Most Cited Cases

Scienter requirement, for stating claim of § 10(b) securities fraud against manufacturer of lasers, was satisfied through allegations that representatives of manufacturer deliberately and intentionally issued press release creating implication that order for lasers was connected with buyer's development of new product to protect civilian aircraft from missile attacks, commissioned by Department of Homeland Security, after being expressly told by buyer's representatives that there was no such connection. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u-4(b)(2).

**[6] Securities Regulation 349B ⬤══60.47**

349B Securities Regulation
  349BI Federal Regulation
    349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation
        349Bk60.43 Grounds of and Defenses to Liability
          349Bk60.47 k. Causation; Existence of Injury. Most Cited Cases

Investors satisfied requirement for stating claim under § 10(b), that loss causation be shown, through allegations that value of shares dropped 15%, to $1.27 per share, on date that Securities and Exchange Commission (SEC) informed manufacturer of lasers that accuracy of two press releases regarding major contract were being investigated, and that there was further drop when manufacturer filed Form 8-K announcing investigation. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

**[7] Securities Regulation 349B ⬤══60.40**

349B Securities Regulation
  349BI Federal Regulation
    349BI(C) Trading and Markets

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                Page 3

--- F.Supp.2d ----, 2006 WL 2772581 (D.N.H.), 2006 DNH 109
(Cite as: --- F.Supp.2d ----)

349BI(C)7 Fraud and Manipulation
    349Bk60.39 Persons Liable
        349Bk60.40 k. In General; Control
Persons. Most Cited Cases
Claim of control person liability, under Securities
Exchange Act, was stated against chief executive
officer (CEO) of laser manufacturer, through
allegations that CEO participated in and directed
preparation and issuance of two press releases
overstating importance of sales of lasers to potential
developer of civilian aircraft antimissile protection
systems. Securities Exchange Act of 1934, § 20(a),
15 U.S.C.A. § 78t(a).

**[8] Securities Regulation 349B ⇐60.40**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.39 Persons Liable
                    349Bk60.40 k. In General; Control
Persons. Most Cited Cases
Claim of control person liability under Securities
Exchange Act was stated against chief financial
officer (CFO) and chief operating officer (COO) of
laser manufacturer, through allegations that they
were directly responsible for day-to-day operations
of manufacturer, had received copies of two press
releases misleadingly overstating importance of
sales of lasers to potential developer of civilian
aircraft missile protection system, and were given
opportunity to correct them. Securities Exchange
Act of 1934, § 20(a), 15 U.S.C.A. § 78t(a).

Mark L. Mallory, Christine Friedman, Mallory &
Friedman PLLC, Jennifer A. Eber, William L.
Chapman, Orr & Reno PA, Concord, NH, Laurence
Rosen, Rosen Law Firm PA, New York, NY, for
Plaintiffs.
Alexander J. Walker, Devine Millimet & Branch
PA, Manchester, NH, Francis G. Kelleher, Inez H.
Friedman-Boyce, R. Todd Cronan, Douglas C.
Doskocil, Goodwin Procter LLP, Boston, MA,
Stephen R. Galoob, Goodwin Procter LLP,
Washington, DC, for Defendants.

*ORDER*

MCAULIFFE, Chief Judge.
*1 Plaintiffs in this class action bring suit against
StockerYale, Inc., its Chief Executive Officer
(Mark W. Blodgett), its Chief Financial Officer
(Francis J. O'Brien), its Chief Operating Officer
(Ricardo A. Diaz), and one of its directors
(Lawrence W. Blodgett). Plaintiffs' First Amended
Complaint (document no. 18) alleges: violations of
section 10(b) of the Securities Exchange Act of
1934 (15 U.S.C. § 78j(b)) and Rule 10b-5 (17
C.F.R. § 240.10b-5), by StockerYale and Mark
Blodgett (Count I); violations of section 20A of the
Act (15 U.S.C. § 78t-1), by StockerYale, Mark
Blodgett, and Lawrence Blodgett (Count II); and
violations of section 20(a) of the Act (15 U.S.C. §
78t(a)), by Mark Blodgett, Diaz, and O'Brien
(Count III). The crux of plaintiffs' claim is that
StockerYale issued false or misleading press
releases on April 19 and 21, 2004, which resulted in
a dramatic increase in the price of StockerYale
shares, and that Mark Blodgett and Lawrence
Blodgett unlawfully benefitted from their
knowledge of the falsity of those press releases by
selling StockerYale shares the day after the first
press release was issued, shortly before it's accuracy
was called into question in the media, and near the
peak of the stock's brief spike in price.

Before the court are: a motion to dismiss filed by
StockerYale and Mark Blodgett (document no. 20);
a motion to dismiss filed by Lawrence Blodgett,
Diaz, and O'Brien (document no. 22); and a motion
to strike portions of the memorandum of law in
support of document no. 20 as well as two exhibits
appended thereto (document no. 24). For the
reasons given, defendants' motions to dismiss are
denied and plaintiffs' motion to strike is granted.

**Motion to Strike**

[1] Plaintiffs move to strike two exhibits appended
to defendants' legal memorandum, as well as
various references to facts in that memorandum.
Specifically, plaintiffs object to defendants' reliance
on: (1) a "market commentary" titled "Near-Term
Spotlight-The Security Industry," by Paul Tracy,
editor of *StreetAuthority Market Advisor* (Defs.'
Mem. of Law (document no. 21), Ex. F); (2) a set of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2006 WL 2772581 (D.N.H.), 2006 DNH 109
**(Cite as: --- F.Supp.2d ----)**

six graphs purporting to depict prices of six different "microcap security stocks" (*id.*, Ex. G); and (3) various factual allegations supporting defendants' interpretation of the press releases that plaintiffs claim to have been false or misleading.

"The fate of a motion to dismiss under Rule 12(b)(6) ordinarily depends on the allegations contained within the four corners of the plaintiff's complaint." *Young v. Lepone,* 305 F.3d 1, 10-11 (1st Cir.2002). However, "[w]hen the factual allegations of a complaint revolve around a document whose authenticity is unchallenged, 'that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6).' " *Id.* at 11 (quoting *Beddall v. State St. Bank & Trust Co.,* 137 F.3d 12, 17 (1st Cir.1998); citing 2 James Wm. Moore Et Al., Moore's Federal Practice ¶ 12.34[2] (3d ed.1997)). As well, the Federal Rules of Evidence permit a court to take judicial notice of facts " capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

**\*2 Market commentary.** The "market commentary " attached as Exhibit F to defendants' memorandum of law was published on April 12, 2004-five days before the first StockerYale press release was issued-and it discusses the "red-hot" performance of several stocks in the "security sector." Plaintiffs move to strike Exhibit F on grounds that it is not relevant to their complaint and is also immaterial, irrelevant, and inadmissible as both opinion testimony and hearsay. Defendants counter that the article is background information subject to judicial notice under Fed. R. Evid. 201(b), and is "pertinent to the action." *In re Polaroid Corp. Sec. Litig.,* 134 F.Supp.2d 176, 182 (D.Mass.2001).

The disputed market commentary is not "pertinent to the action" because it is not a document on which plaintiffs' action is based. *See id.* (citing *Romani v. Shearson Lehman Hutton,* 929 F.2d 875, 878 (1st Cir.1991); *Fudge v. Penthouse Int'l, Ltd.,* 840 F.2d 1012, 1015 (1st Cir.1988)). Nor are the editorial comments and analysis contained in the commentary about overall trends in the security sector the kind of information that is subject to

judicial notice. *See Kramer v. Time Warner, Inc.,* 937 F.2d 767, 773 (2d Cir.1991) ("The [district court's] illustrative reference to the condition of the junk bond market was thus not a ground for decision and does not run afoul of the rule that a district court must confine itself to the four corners of the complaint when deciding a motion to dismiss under Rule 12(b)(6)."). And, while the strictly factual information contained in the market commentary describing the market capitalization and earnings of EFJ Incorporated, NAPCO Security Systems, IPIX Corp., Arotech Corp., and Magal Security Systems is probably subject to judicial notice, because that information consists of facts " capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b), defendants have not shown how such information is relevant to the pending motions.

**Stock price data.** Attached as Exhibit G to the memorandum is a set of graphs titled, collectively, " April 2004 Stock Prices of Comparable Microcap Security Companies," which purports to show the stock prices for Alanco Technologies, Arotech, Bulldog Technologies, ComCam, Inc., ICTS International, and Metal Storm Ltd. about the time StockerYale issued the two disputed press releases. Plaintiffs move to strike Exhibit G on grounds that it is not relevant to their complaint and is of questionable evidentiary value.

As with the market commentary, the stock price information in Exhibit G is not pertinent to the issues currently before the court, and so are not considered.

**Facts in the memorandum of law.** Plaintiffs also contend that defendants' memorandum of law relies on asserted facts drawn from beyond the four corners of the complaint.[FN1] To the extent that is the case, those facts not properly before the court will be disregarded.

### Motions to Dismiss

*I. The Legal Standard*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2006 WL 2772581 (D.N.H.), 2006 DNH 109
**(Cite as: — F.Supp.2d —)**

**\*3** A motion to dismiss for "failure to state a claim upon which relief can be granted," Fed. R. Civ. P. 12(b)(6), requires the court to conduct a limited inquiry, focusing not on "whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court must "accept as true the factual allegations of the complaint and construe all reasonable inferences therefrom in favor of [plaintiff]." *Perry v. N.E. Bus. Serv., Inc.,* 347 F.3d 343, 344 (1st Cir.2003) (citing *Beddall,* 137 F.3d at 16). However, the court need not credit "claims that are made in the complaint if they are 'bald assertions' or 'unsupportable conclusions.' " *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.,* 360 F.3d 220, 224 (1st Cir.2004) (quoting *Arruda v. Sears, Roebuck & Co.,* 310 F.3d 13, 18 (1st Cir.2002)). Finally, "[a] district court may grant a 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted only if 'it clearly appears, according to the facts alleged, that the plaintiff cannot recover on any viable theory.' " *Pomerleau v. W. Springfield Pub. Sch.,* 362 F.3d 143, 145 (1st Cir.2004) (quoting *Correa-Martinez v. Arrillaga-Belendez,* 903 F.2d 49, 52 (1st Cir.1990)).

Because count one of plaintiffs' complaint has been brought under section 10(b) of the Securities Exchange Act, it is subject to a heightened pleading standard, set out in statute and rule. Under the provisions of the Private Securities Litigation Reform Act ("PSLRA") of 1995:
In any private action arising under this chapter in which the plaintiff alleges that the defendant-
**(A)** made an untrue statement of material fact; or
**(B)** omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading;
the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is

formed.

15 U.S.C. § 78u-4(b)(1). Furthermore:In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b)(2).

The First Circuit has held that "[t]he PSLRA imposes requirements for pleading with particularity that are consistent with [the] circuit's prior rigorous requirements for pleading fraud with particularity under Fed.R.Civ.P. 9(b)." *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 188 (1st Cir.1999). According to Rule 9(b), "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Moreover, "[t]he particularity requirement is regarded by the Court of Appeals for this Circuit as being of fundamental importance." *In re Boston Tech., Inc. Sec. Litig.,* 8 F.Supp.2d 43, 52 (D.Mass.1998). The particularity "requirement ' entails specifying in the pleader's complaint the time, place, and content of the alleged false or fraudulent representations.' " *Arruda v. Sears, Roebuck & Co.,* 310 F.3d 13, 19 (1st Cir.2002) (quoting *Powers v. Boston Cooper Corp.,* 926 F.2d 109, 111 (1st Cir.1991)). In addition, "the complaint must set forth *specific facts* that make it reasonable to believe that the defendant knew that a statement was materially false or misleading. The rule requires that the *particular times, dates, places, or other details* of the alleged fraudulent involvement of the actors be alleged." *Boston Tech.,* 8 F.Supp.2d at 53 (quoting *Gross v. Summa Four, Inc.,* 93 F.3d 987, 991 (1st Cir.1996) (emphasis added)).

**\*4** **[2]** Moreover, "[i]t is not the law that a 10b-5 complaint is to be judged on the basis of the general flavor derived from an issuer's collective statements over a long period of time." *Boston Tech.,* 8 F.Supp.2d at 56. Rather, "[10b-5] allegations [must

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                    Page 6

--- F.Supp.2d ----, 2006 WL 2772581 (D.N.H.), 2006 DNH 109
(Cite as: — F.Supp.2d ——)

be organized] into discrete units that are, standing alone, each capable of evaluation." *Id.* at 55-56 (quoting *Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 284 (3d Cir.1992)). However, the fact that a statement is literally accurate does not preclude liability under federal securities laws. " Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors. For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *McMahan v. Wherehouse Entertainment, Inc.,* 900 F.2d 576, 579 (2d Cir.1990). Under the foregoing standards, " emphasis and gloss can, in the right circumstances, create liability." *Isquith v. Middle S. Utils., Inc.,* 847 F.2d 186, 203 (5th Cir.1988).

*Lucia v. Prospect St. High Income Portfolio, Inc.,* 36 F.3d 170, 175 (1st Cir.1994) (citations omitted).

Finally, "[u]nder the PSLRA, the complaint must state with particularity facts that give rise to a ' strong inference' of scienter, rather than merely a reasonable inference." *Mesko v. Cabletron Sys., Inc (In re Cabletron Sys., Inc.),* 311 F.3d 11, 38 (1st Cir.2002) (citing 15 U.S.C. § 78u-4(b)(2); *Greebel,* 194 F.3d at 195-96). That is, "[i]t is clear that scienter allegations now must be judged under the ' strong inference' standard at the motion to dismiss stage." *Greebel,* 194 F.3d at 197.

### 2. Factual Background

StockerYale designs and manufactures lasers. At all times relevant to this suit, Mark Blodgett was StockerYale's Chairman and Chief Executive Officer; Ricardo Diaz was StockerYale's Chief Operating Officer; and Francis O'Brien was StockerYale's Executive Vice President, Chief Finan cial Officer, and Treasurer. Lawrence Blodgett was a StockerYale director.

In July, 2002, StockerYale entered into an agreement with BAE Systems ("BAE") to supply BAE with seven "reference lasers" for "National Defense use," at a price of $91,350. Two of the lasers were to be delivered by September 13, 2002, with the remaining five to be delivered by November 22, 2002. (Pls.' Obj. to Defs.' Mot. to Strike (document no. 27), Ex. 4.)

On October 11, 2002, StockerYale issued a press release which stated, in pertinent part: StockerYale, Inc. (NASDAQ: STKR), an independent supplier of photonics-based products, has been awarded a contract from BAE SYSTEMS to supply custom-designed thermoelectrically cooled lasers for their Advanced Threat Infrared Countermeasures (ATIRCM) system. StockerYale will initially supply several specialized lasers to the Nashua, N.H.-based Information & Electronic Warfare Systems (IEWS) business unit in the fourth quarter of 2002, with the opportunity for long-term deliveries through 2020. *5 BAE SYSTEMS' ATIRCM is the next-generation countermeasure to protect military aircraft from infrared-guided missiles. This system is currently designated for installation on the U.S. Army AH-64, UH-60, CH-47, EH-60, and various other aircraft.

(Defs.' Mem. of Law (document no. 21), Ex. C.) Plaintiffs allege that the October 11 press release was intended to announce the July, 2002, contract, but its reference to "long-term deliveries through 2020" appears to be inconsistent with the July, 2002, contract. That contract called for only two deliveries, in September and November, 2002. Thus, it is not clear whether the October 11 press release referred to StockerYale's July, 2002, contract with BAE or to some other agreement between the two companies. Fortunately, however, that press release is not central to plaintiffs' claims.

In December, 2003, StockerYale entered into another contract with BAE, for "Repackaging of 2 ATIRCM Reference Lasers and completion of 2 prototypes," at a price of $70,000. The two prototype units were scheduled for delivery by April 14, 2004. (Pls.' Obj. to Defs.' Mot. to Strike (document no. 27), Ex. 3.)

Unlike the July, 2002, contract, which specified that the subject lasers were for "National Defense use," the December, 2003, contract included no such

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

Page 7

--- F.Supp.2d ----, 2006 WL 2772581 (D.N.H.), 2006 DNH 109
(Cite as: --- F.Supp.2d ----)

specification, nor did it include a Defense Priority and Allocation Requirements ("DPAS") rating, which is required for contracts supporting both military and homeland security programs. The contract provided no other information regarding the uses to which the prototype lasers might be put.

On January 6, 2004, the United States Department of Homeland Security ("Homeland Security") announced that three contractors, including BAE, had each been awarded $2 million in Phase I of a project to determine the viability of technology designed to protect commercial aircraft against shoulder-fired missiles.

Upon learning of BAE's Homeland Security contract, Mark Blodgett directed StockerYale's Vice President of Corporate Marketing to prepare a press release announcing that the December, 2003, contract between StockerYale and BAE was connected to BAE's January, 2004, Homeland Security contract. BAE gave StockerYale no information suggesting any such connection, and the proposed press release was never issued.

In April, 2004, BAE placed an order with StockerYale for twenty-one lasers, at a price of $200,000.[FN2]

On April 19, 2004, StockerYale issued a press release titled "StockerYale Receives Order from BAE for Specialized Lasers Integral to Military Missile Countermeasure Systems." That press release was subtitled: "The Company is Also Developing Customized Lasers for Missile Countermeasure System on Commercial Planes." It stated, in pertinent part:
StockerYale, Inc. (NASDAQ: STKR-News), a leading independent provider of photonics-based products, has received a noteworthy order from BAE SYSTEMS to supply lasers that are integral to an airborne military missile defense system. The Company's specialized lasers are part of the Advanced Threat Infrared Countermeasure (ATIRCM) system, which is the next-generation countermeasure system designed to protect military aircraft from infrared-guided missiles.
*6 The Company is also developing a customized laser for the development of a missile

countermeasure system for commercial planes under a recent contract received from the Nashua, N.H.-based Information & Electronic Warfare Systems (IEWS) business unit of BAE. This commercial missile defense system is an adaptation of the ATIRCM system concept. BAE is one of three companies awarded a contract from the Department of Homeland Security to determine the feasibility of adapting the military missile-defense system for commercial planes. If the systems can be adapted, design contracts will be awarded to one or two of the companies to build and test prototypes.
"We are pleased to have been chosen by BAE once again to participate in this important program designed to protect aircraft from attack by shoulder-launched missiles," said Mark W. Blodgett, StockerYale's chief executive officer. "By successfully developing and delivering customized lasers for BAE's ATIRCM military system, StockerYale is well positioned to deliver a variation of this laser for use within this prospective commercial application." Blodgett concluded, "We realize the importance and practical implications that such a commercial countermeasure system could have and look forward to supporting BAE on this project."

(Defs.' Mem. of Law (document no. 21), Ex. A.)

StockerYale did not seek BAE's approval of the April 19 press release, in violation of its obligation to do so under established BAE corporate policy. Moreover, at least one StockerYale official (Luc Many, Senior Vice-President for Sales and Marketing) counseled against issuing the press release, on grounds that: (1) the April, 2004, order was "old news" resulting from a 2002 contract; (2) StockerYale had not been able to verify that its December, 2003, contract with BAE was related to BAE's Homeland Security contract; and (3) BAE had not approved the press release, and would find it unacceptable. When BAE learned of the April 19 press release, it notified StockerYale that the two lasers it purchased pursuant to the December, 2003, contract were not for uses related to its Homeland Security contract. Moreover, StockerYale had not received *any* order related to BAE's January, 2004, Homeland Security contract.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2006 WL 2772581 (D.N.H.), 2006 DNH 109
(Cite as: --- F.Supp.2d ----)

On April 19, 2004, the date of the press release quoted above, StockerYale shares began trading at $1.43. Shortly after the press release was issued, the stock rose to a daily high of $4.28, and closed at $4.15. In after-hours trading that day, StockerYale traded at a high of $6.04 per share.

On April 20, 2004, StockerYale opened at $6.70, hit a daily high of $7.75, and closed at $3.74, after hitting a daily low of $3.53.[FN3] That same morning, Mark Blodgett sold $1.64 million worth of StockerYale shares(at $6.56 per share). Also that morning, Lawrence Blodgett sold $352,000 worth of StockerYale shares, in two blocks (at $6.12 per share and $7.19 per share).

Early in the morning of April 20, CNBC Nasdaq reporter Leslie Laroche contacted StockerYale's Vice President for Corporate Marketing, James Gargas, and inquired about the "new orders" reported in the April 19 press release. Gargas told Laroche that the order had not resulted from a new contract, but was related to an existing contract with BAE, announced to the public in October, 2002. He also told Laroche that StockerYale was providing BAE with prototype lasers for its contract to develop a prototype system to protect aircraft from shoulder-launched lasers.

*7 At approximately 1:05 p.m. on April 20, after the Blodgetts had made their trades, Laroche broadcast a report on the April 19 press release, telling viewers that she had learned that StockerYale had not received a new contract, but was merely filling orders under an old, previously announced agreement with BAE. After that report aired, StockerYale shares fell from their daily high of $7.75 to a closing price of $3.74.

On April 21, 2004, after the close of trading, presumably in response to the CNBC report and/or the information StockerYale received from BAE, StockerYale issued another press release, titled "StockerYale Provides Additional Information with Respect to Orders Received from BAE." That release, issued at Mark Blodgett's direction, stated, in pertinent part:
StockerYale, Inc. (NASDAQ: STKR-News), a leading independent provider of photonics-based

products provides additional information with respect to orders received from BAE.
StockerYale's press release of April 19, 2004 referenced two orders that the Company had received from BAE Systems.
The Company wishes to provide additional information with respect to the terms of those orders. The first order mentioned was a production order from BAE under its contract with the U.S. government to supply an airborne military defense system against heat-seeking missiles. BAE was awarded that contract in October 2002 and in a press release dated October 11, 2002 the Company announced that it had been awarded a contract from BAE to supply the Company's thermoelectrically cooled laser to BAE for its ATIRCM program. The contract that BAE has with the U.S. government calls for deliveries through 2020 and StockerYale expects to receive additional orders under this contract.
The second order that the Company received from BAE Systems was an order for the delivery of customized lasers for an adaptation of the military ATIRCM system for use on commercial or military airplanes.

(Defs.' Mem. of Law (document no. 21), Ex. B.)

While the April 21 press release represented that StockerYale was supplying lasers to BAE pursuant to an agreement between BAE and the U.S. Government that called for deliveries from BAE to the government through 2020, the actual completion date of BAE's contract to deliver ATIRCM systems is July 14, 2007.

When it learned of the April 21 press release, one day after it was issued, BAE complained to StockerYale that both press releases were inaccurate, and insisted that StockerYale remove them from the company's web site. StockerYale complied immediately, but never fully corrected the misrepresentations contained in the two press releases.

At the close of trading on April 21, before the April 21 press release was issued, StockerYale shares were trading at $3.17. StockerYale opened at $4.81 on April 22, and reached a daily high of $4.99

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                          Page 9

--- F.Supp.2d ----, 2006 WL 2772581 (D.N.H.), 2006 DNH 109
**(Cite as: — F.Supp.2d ——)**

before closing at $3.68. On May 24, 2005, the last day of the class period, StockerYale closed at $0.76 per share.

**\*8** Also on May 24, 2005, the SEC filed a civil action against Mark Blodgett and StockerYale, alleging violations of section 10(b) of the Exchange Act and Rule 10b-5, based on the issuance of the April 19 and 21 press releases. [FN4] That action resulted in consent judgments against Blodgett and StockerYale under which Blodgett was ordered to pay disgorgement of $754,877 and a civil penalty of $120,000, and both StockerYale and Mark Blodgett were enjoined from committing any further violations of section 10(b).

This action followed. In it, plaintiffs claim that the April 19 press release was false and misleading because it stated that: (1) StockerYale was developing a customized laser for a missile countermeasure to protect commercial aircraft; (2) StockerYale was doing so as part of a Homeland Security project; and (3) StockerYale had received an order from BAE to supply lasers to protect commercial aircraft. Plaintiffs further claim that the April 21 press release was false and misleading because it reiterated the misrepresentations stated in the April 19 press release and further misrepresented that BAE had a contract to deliver military missile-defense systems to the U.S. government through 2020.

### 3. StockerYale and Mark Blodgett (document no. 20)

Defendants [FN5] move to dismiss Count I, plaintiffs' section 10(b) claim, on grounds that: (1) every statement in the April, 2004, press releases was either an accurate statement of historical fact, an expression of opinion or belief, or a forward-looking statement accompanied by meaningful cautionary language; (2) plaintiffs fail to allege sufficient facts to support a strong inference of scienter; and (3) plaintiffs do not adequately plead loss causation. Defendants also move to dismiss Count II on grounds that plaintiffs' failure to state a claim under section 10(b) necessarily requires dismissal of their section 20A claim. Mark

Blodgett moves to dismiss Count III on grounds that plaintiffs have failed to allege facts establishing that he is subject to control person liability.

### A. Count I-The Section 10(b) Claim

Section 10(b) of the Securities Exchange Act of 1934 provides:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange-
...
**(b)** To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act), any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j. Rule 10b-5, promulgated by the SEC, provides:It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
**\*9** (a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. "The Supreme Court has described the 'basic elements' of a claim under Rule 10b-5 as including: (1) 'a material misrepresentation (or omission)'; (2) 'scienter, i.e.,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2006 WL 2772581 (D.N.H.), 2006 DNH 109
**(Cite as: --- F.Supp.2d ----)**

a wrongful state of mind'; (3) 'a connection with the purchase or sale of a security'; (4) 'reliance'; (5) 'economic loss'; and (6) 'loss causation.' " *Brody v. Stone & Webster, Inc. (In re Stone & Webster, Inc., Sec. Litig.),* 414 F.3d 187, 193 (1st Cir.2005) (quoting *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 341, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) (emphasis omitted); citing *Wortley v. Camplin,* 333 F.3d 284, 294 (1st Cir.2003); *Geffon v. Micrion Corp.,* 249 F.3d 29, 34 (1st Cir.2001)).

A statement is false or misleading if the person making it has actual factual knowledge, at the time of the statement, that makes the statement false or misleading. *See, e.g., Cabletron,* 311 F.3d at 36; *Aldridge v. A.T. Cross Corp.,* 284 F.3d 72, 79 (1st Cir.2002).
In the First Circuit, "general averments of defendants' knowledge of material falsity [do] not suffice." *Gross,* 93 F.3d at 991. A 10b-5 plaintiff must allege "details of [defendants'] alleged fraudulent involvement," including specifics as to what defendants had knowledge of and when. *Id.* To satisfy this requirement, complaints typically identify internal reports, memoranda, or the like, and allege both the contents of those documents and defendants' possession of them at the relevant time. *See, e.g., Serabian* [*v. Amoskeag Bank Shares, Inc.* ], 24 F.3d [357,] 368 [ (1st Cir.1994) ] (plaintiffs, " cit [ing] to reports and documents presented to defendants at relevant times that were inconsistent with the defendants' public statements ... satisfies the necessary pleading requirements.") Moreover, such citation must be "specifically" made. *Id.* Recently, in *Shaw* [*v. Digital Equip. Corp.*], 82 F.3d 1194 (1st Cir.1996), the Court ruled that merely alleging the existence of a highly efficient reporting system-even one that would logically lead to internal reports on the relevant subject matter-was not enough. The Court wrote that such allegations "may speak to the question of *how* defendants might have known what they allegedly knew, but [they are insufficient] absent some indication of the specific factual *content* of any single report generated by the alleged reporting system." 82 F.3d at 1224 & n. 38 (emphasis in original).

*Boston Tech.,* 8 F.Supp.2d at 57-58 (footnote

omitted).

*\*10* "Liability under section 10(b) and Rule 10b-5 also requires scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.' " *Cabletron,* 311 F.3d at 38 (quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)). "To prove scienter, a plaintiff "must show either that the defendants consciously intended to defraud, or that they acted with a high degree of recklessness." *Stone & Webster,* 414 F.3d at 193 (quoting *Aldridge,* 284 F.3d at 82). However, "this circuit has rejected any rigid formula for pleading scienter, preferring to rely on a 'fact-specific approach' that proceeds case by case." *Cabletron,* 311 F.3d at 38 (citing *Aldridge,* 284 F.3d at 82; *Greebel,* 194 F.3d at 196).

*1. The April 19 Press Release*

[3] Based on a statement-by-statement analysis, defendants argue that every sentence in the April 19 press release is literally true, and say they cannot be held liable for plaintiffs' misinterpretation of their accurate statements. That claim is of questionable merit, given the fact that the press release represented that StockerYale was "developing a customized laser for the development of a missile countermeasure system for *commercial planes under a recent contract* received from the Nashua, N.H.-based Information & Electronic Warfare Systems (IEWS) business unit of BAE"-an assertion that BAE flatly rejected as false. Nevertheless, even if each of the individual sentences in the April 19 press release was literally accurate, and even though the press release "nowhere states that the prototype laser is being funded by monies from the [Homeland Security]," (Defs.' Mem. of Law (document no. 21) at 10), that press release plainly suggested that StockerYale had a contract with BAE to provide BAE with lasers for BAE to use in fulfillment of a Homeland Security contract. The press release expressly stated that "BAE [was] one of three companies awarded a contract from the Department of Homeland Security," and the only plausible reason for StockerYale to include a reference to BAE's Homeland Security contract in a press release announcing StockerYale's contract

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2006 WL 2772581 (D.N.H.), 2006 DNH 109
(Cite as: --- F.Supp.2d ----)

with BAE is to imply a connection between StockerYale's contract with BAE and BAE's contract with Homeland Security. Because plaintiffs have adequately alleged that the customized lasers StockerYale agreed to sell BAE in December, 2003, were not for BAE's Homeland Security project, they have adequately alleged that the April 19 press release contained a false or misleading statement.

However, under the relevant pleading standard, that is not enough to survive defendants' motion to dismiss. Not only must plaintiffs allege a false statement, they must also allege, with factual support, that the person making the statement knew it was false. The facts alleged, if proven, would establish that defendants did not know that the prototype lasers were for use in BAE's Homeland Security project, yet implied that they were.

*11 The complaint adequately alleges that StockerYale did not know that the lasers in question would be used by BAE in its Homeland Security project as part of a system to protect commercial aircraft, and had no reason to think, or represent, that they would be. Obviously, the positive implication was fraught with economic significance. As it turns out, the baseless implication was not just misleading, it was actually false. The allegations in the complaint are sufficient to support a claim that StockerYale knew that the press release contained false or misleading information at the time it was issued, because it knew that there was no reasonable basis to make the misleading and deceptive statements (or, at a minimum, implications) that it stood to gain substantially from BAE's governmental contracts. Moreover, even if those allegations are insufficient to support a claim that StockerYale consciously intended to defraud, they are certainly sufficient to support a claim that it acted with a high degree of recklessness. *See, e.g., Aldridge,* 284 F.3d at 82; *Greebel,* 194 F.3d at 198-201.

Because plaintiffs have adequately alleged defendants' contemporaneous possession of facts that established the false or misleading nature of the April 19 press release (i.e., that nothing supported the clear implications disseminated), defendants are not entitled to dismissal of Count I as it relates to

the April 19 press release.

## 2. The April 21 Press Release

[4] Plaintiffs make two claims concerning the April 21 press release. They say it misrepresented the duration of BAE's October, 2002, agreement with the U.S. government to supply an airborne military defense system against heat-seeking missiles, and that it perpetuated the false statements in the April 21 press release concerning the relationship between the StockerYale-BAE contract and the BAE-Homeland Security contract.

Plaintiffs adequately allege the falsity of StockerYale's statement that "[t]he contract that BAE has with the U.S. government calls for deliveries through 2020," by citing a Department of Defense press release that listed January 14, 2007, as the completion date of BAE's ATIRCM contract. Plaintiffs have also alleged facts from which it would be reasonable to infer that Mark Blodgett and/or other StockerYale employees knew very well that the representations regarding BAE's ATIRCM contract, including its termination date, had no substantial basis in facts known to them-that is, the stated facts were simply invented by StockerYale. Accordingly, liability for the statement in the April 21 press release concerning the duration of BAE's ATIRCM contract with the U.S. government, is adequately pled.

Plaintiffs' second claim regarding the April 21 press release also survives defendants' motion to dismiss. As explained above, plaintiffs adequately allege that the April 19 press release misleadingly suggested that StockerYale was providing lasers to BAE for BAE's use in fulfilling its Homeland Security contract. Plaintiffs also allege that after BAE learned of the April 19 press release, a BAE representative advised StockerYale that the December, 2003, contract between StockerYale and BAE was not connected with BAE's January, 2004, Homeland Security contract. Given that information, plaintiffs argue that it was false or misleading for StockerYale to state, in the April 21 press release, that "[t]he second order the Company received from BAE Systems [*i.e.,* the December,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                    Page 12

--- F.Supp.2d ----, 2006 WL 2772581 (D.N.H.), 2006 DNH 109
**(Cite as: — F.Supp.2d —)**

2003, order] was an order for the delivery of customized lasers for an adaptation of the military ATIRCM system for use on commercial or military airplanes."

*12 Plaintiffs have alleged facts from which it would be reasonable to infer that pertinent StockerYale officials had no basis for claiming that the lasers StockerYale provided under the December, 2003, agreement were for use in an adaptation of BAE's military ATIRCM system for commercial or military airplanes. In the aftermath of the April 19 press release, which falsely implied that StockerYale was providing lasers for use BAE's Homeland Security project-a project directed toward the protection of commercial airplanes-the April 21 statement that StockerYale was providing lasers for BAE's adaptation of ATIRCM lasers for military or commercial use was tantamount to a statement that StockerYale was providing lasers for BAE's Homeland Security project. Because StockerYale is alleged to have known, before the April 21 press release was issued, that BAE was not using StockerYale lasers for its Homeland Security project, plaintiffs have adequately alleged both the falsity of the April 21 press release and StockerYale's knowledge of that falsity.

[5] StockerYale has also adequately alleged scienter. "[E]vidence of conscious wrongdoing ... may provide the 'something more' necessary to prove scienter." *Cabletron*, 311 F.3d at 39 (quoting *Greebel*, 194 F.3d at 201; citing A. Morales Olazabal, *The Search for "Middle Ground": Towards a Harmonized Interpretation of the Private Securities Litigation Reform Act's New Pleading Standard*, 6 Stan. J.L. Bus. & Fin.. 153, 187-88 (2001) ("[T]he obvious should not go unstated, and that is that allegations of intentionally fraudulent conduct also will permit the drawing of a strong inference of scienter.")).

Here, plaintiffs allege that StockerYale was told, directly by BAE, that StockerYale's lasers were not being used as part of BAE's Homeland Security project. But, rather than stating that in its April 21 press release, StockerYale held to its earlier statement that it was providing lasers for BAE's adaptation of its ATIRCM system for use on

military or commercial airplanes-a project identified as a Homeland Security project in the April 19 press release. That is, although StockerYale did not include a Homeland Security reference in its April 21 press release, it did not expressly disclaim a connection with BAE's Homeland Security project, even when given substantial reason to believe that readers of the April 19 press release would have concluded that StockerYale was claiming it provided lasers for BAE's Homeland Security project. Thus, plaintiffs' "complaint survives the requirement that its pleadings raise a strong inference of scienter." *Aldridge*, 284 F.3d at 83 (explaining that "the fact that the defendants published statements when they knew facts suggesting that statements were inaccurate or misleadingly incomplete is classic evidence of scienter") (citing *State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 665 (8th Cir.2001)).

Moreover, defendants' failure to seek BAE's prior approval of the April 21 press release demonstrated a "high degree of recklessness," *Stone & Webster*, 414 F.3d at 193 (citation omitted), given StockerYale's established obligation to do so and BAE's interest in the subject matter, as evidenced by BAE's quick response to the April 19 press release.

*13 [6] Finally, plaintiffs have adequately alleged loss causation. Defendants suggest that plaintiffs fail to allege loss causation because the allegation that defendants never corrected misinformation in the two press releases precludes them from alleging a necessary element of loss causation, namely that revelation of defendants' misrepresentation caused StockerYale stock to drop in value. Defendants further argue that the factual allegations in plaintiffs' complaint do not adequately eliminate company-specific developments and industry-wide market factors as potential reasons for the fluctuations in the price of StockerYale shares during the class period. Even under the relatively strict standard imposed by *Dura*, 544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577, plaintiffs have adequately alleged loss causation.

In *Dura*, the Supreme Court rejected "a Ninth Circuit holding that a plaintiff can satisfy [the loss

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2006 WL 2772581 (D.N.H.), 2006 DNH 109
**(Cite as: --- F.Supp.2d ----)**

causation] requirement ... simply by alleging in the complaint and subsequently establishing that 'the price' of the security 'on the date of purchase was inflated because of the misrepresentation.' " 544 U.S. at 344, 125 S.Ct. 1627 (quoting *Broudo v. Dura Pharmaceuticals, Inc.,* 339 F.3d 933, 938 (9th Cir.2003)) (emphasis omitted). Instead, the Supreme Court held that "a person who misrepresents the financial condition of a corporation in order to sell its stock becomes liable to a relying purchaser 'for the loss' the purchaser sustains 'when the facts ... become generally known ' and 'as a result' share value 'depreciate [s].' " 544 U.S. at 344, 125 S.Ct. 1627 (quoting Restatement (Second) Of Torts § 548A, cmt. b, at 107 (1977)).

Notably, the rule in *Dura* does not require that the party accused of making a misrepresentation also be the source of corrective information that results in a decline in stock prices. Plaintiffs' allegation that defendants themselves never corrected the misinformation contained in the April 21 press release does not preclude pleading loss causation. Moreover, plaintiffs do allege that StockerYale shares dropped fifteen percent, to $1.27 per share, on the day the SEC informed StockerYale it was investigating the accuracy of the two press releases. And, they further allege that when the public was informed of the SEC investigation, by means of a Form 8-K filed by StockerYale, its stock dropped to $0.84 per share in after-hours trading. That is enough to meet the requirements established in *Dura* concerning the causal connection between the release of corrective information and the decline in the price of StockerYale shares.

Defendants' reference to a wide range of economic and other factors that may have caused or contributed to the decline in price of StockerYale shares raises issues that will be addressed at later stages of this litigation, but those possibilities do not warrant dismissal, given the factual allegations discussed above. Similarly, the possible existence of trends in the industry at the time of the run-up in StockerYale share prices presents an issue of fact, but does not overcome plaintiffs' properly supported allegation of a rise in stock prices directly after and attributable to the April 19 and 21 press releases.

*14 Because plaintiffs have adequately alleged the false or misleading nature of the April 19 and 21 press releases, defendants' scienter, and loss causation, defendants are not entitled to dismissal of Count I.

### B. Count II–The Section 20A Claim

Defendants' only argument concerning plaintiffs' section 20A claim is that dismissal of the section 10(b) claim requires dismissal of the section 20A claim. That is a correct statement of the law:
To state a claim for insider trading, the plaintiffs must have adequately alleged a violation of the Exchange Act. *See, e.g., [In re ] Advanta Corp.* [ *Sec. Litig.*], 180 F.3d [525,] 541-42 [ (3d Cir.1999) ] ("claims under section 20(A) are derivative, requiring proof of a separate underlying violation of the Exchange Act"); *Jackson Nat. Life Ins. Co. v. Merrill Lynch & Co., Inc.,* 32 F.3d 697, 703 (2d Cir.1994) ("[T]o state a claim under § 20A, a plaintiff must plead a predicate violation of the '34 Act or its rules and regulations"); *Colby* [*v. Hologic, Inc.,* 817 F.Supp. 204,] 215 [ (D.Mass.1993) ] (insider trading claim deficient: plaintiff "has not sufficiently alleged what ' materially adverse information' any defendant possessed during the 'class period' and hence there can be no duty to avoid trading or to make disclosure to equalize knowledge of insiders and the investing public"). Because the plaintiffs have not stated a claim under Section 10(b), their Section 20A claim also fails.

*Carney v. Cambridge Tech. Partners, Inc.,* 135 F.Supp.2d 235, 257 (D.Mass.2001). Here, however, plaintiffs' section 10(b) claim has not been dismissed. Accordingly, Mark Blodgett is not entitled to dismissal of Count II.

### C. Count III–The Section 20(a) Claim

[7] Mark Blodgett argues that the section 20(a) claim against him must be dismissed because plaintiffs make only boilerplate allegations against him, rather than concrete allegations that he controlled the content and issuance of the disputed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                                    Page 14

--- F.Supp.2d ----, 2006 WL 2772581 (D.N.H.), 2006 DNH 109
(Cite as: --- F.Supp.2d ----)

press releases in a way that could subject him to " control person" liability. Blodgett's argument is without merit.

The "control person" liability section of the Securities and Exchange Act (section 20(a)), provides:
Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

*Stone & Webster,* 414 F.3d at 194 n. 3 (quoting 15 U.S.C. § 78t(a)). "The elements of § 20(a) are generally stated to be (i) an underlying violation of the same chapter of the securities laws by the controlled entity, ... and (ii) control of the primary violator by the defendant." *Id.* at 194(citing 15 U.S.C. § 78t(a); *Aldridge,* 284 F.3d at 84-85).

**\*15** Here, plaintiffs' section 20(a) claim against Mark Blodgett is not based on mere boilerplate assertions concerning Blodgett's position with StockerYale. Rather, plaintiffs allege that Blodgett regularly directed the drafting and issuance of StockerYale press releases, including the one dated April 21. That is more than sufficient to state a claim under section 20(a).

### 4. Lawrence Blodgett, Diaz, and O'Brien (document no. 22)

Lawrence Blodgett is a defendant in Count II (section 20A, insider trading), while Diaz and O'Brien are defendants in Count III (section 20(a), control person liability).

Lawrence Blodgett is not entitled to dismissal of the claim against him for the same reasons that Mark Blodgett is not entitled to dismissal of Count II.

[8] Diaz and O'Brien move to dismiss the section 20(a) claim against them on grounds that plaintiffs

have failed to: (1) state an underlying section 10(b) claim; (2) adequately allege that Diaz and O'Brien were control persons within the meaning of section 20(a); and (3) allege facts giving rise to a strong inference that Diaz and O'Brien acted with scienter.

As discussed above, plaintiffs have adequately alleged section 10(b) claims. As the court of appeals for this circuit recently explained, " § 20(a) does not on its face obligate the plaintiff to plead or prove scienter (or any other state of mind) on the part of the controlling persons named as a defendant. " *Stone & Webster,* 414 F.3d at 194 (footnote omitted). Thus, the only possible ground for dismissal is the argument that plaintiffs have failed to adequately allege that Diaz and O'Brien were control persons.

For purposes of the statute under which plaintiffs seek to hold Diaz and O'Brien liable,
[t]he term "control" (including the terms " controlling," "controlled by," and "under common control with") means under the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.

17 C.F.R. § 240.12b-2. "Ordinarily, '[c]ontrol is a question of fact' not to be 'resolved summarily at the pleading stage.' " *Brumbaugh v. Wave Sys. Corp.,* 416 F.Supp.2d 239, 259 (D.Mass.2006) (quoting *Cabletron,* 311 F.3d at 41 (citation omitted)).

Diaz and O'Brien argue that plaintiffs' assertion of a claim for control person liability rests on little more than a boilerplate allegation that Diaz and O'Brien were corporate officers, and that more is required, including allegations that Diaz and O'Brien participated in drafting or issuing the press releases at issue here. Defendants read the complaint too narrowly, ignoring some of plaintiffs' factual allegations, and they read the law concerning control person liability too broadly, effectively transforming control person liability into direct liability.

Plaintiffs do not simply allege that Diaz and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2006 WL 2772581 (D.N.H.), 2006 DNH 109
**(Cite as: — F.Supp.2d ----)**

O'Brien were officers of StockerYale; they also allege that both were directly responsible for the day-to-day management of the company, possessed the power and authority to control the content of StockerYale's press releases, and were provided copies of the two press releases before they were issued or shortly thereafter, thus giving them the opportunity to prevent issuance or cause them to be corrected. So, this is not a case in which control person liability is premised solely on a defendant's corporate title.

**\*16** Diaz and O'Brien base their motion to dismiss on plaintiffs' failure to allege facts establishing their direct involvement in drafting or issuing the two StockerYale press releases, but a plaintiff need not make such allegations to state a claim under section 20(a). *See, e.g., In re Allaire Corp. Sec. Litig.,* 224 F.Supp.2d 319, 341 (D.Mass.2002) ("Control person liability, unlike primary liability, does not require that individuals have issued the false or misleading statements, but merely that the individuals have controlled the entity that issued the statements.").

To be sure, Diaz and O'Brien may defend against plaintiffs' control person liability claim, but Unlike Rule 10b-5, § 20(a) does not on its face obligate the plaintiff to plead or prove scienter (or any other state of mind) on the part of the controlling persons named as a defendant. Instead, the burden is shifted. The defendant can rebut liability by proving that he or she "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

*Stone & Webster,* 414 F.3d at 194 (quoting 15 U.S.C. § 78t(a)); *see also Donohoe v. Consol. Operating & Prod. Corp.,* 30 F.3d 907, 912 (7th Cir.1994) ("because *good* faith was an affirmative defense to control person liability, the burden of proving good faith was on the defendants") (emphasis in the original). But of course, a plaintiff is under no obligation to plead the facts necessary to negate an affirmative defense that may (or may not) be raised. Thus, defendants have raised no viable challenge to plaintiffs' claim under section 20(a).

Because plaintiffs have alleged facts sufficient to establish their claim for control person liability against Diaz and O'Brien, Diaz and O'Brien are not entitled to dismissal Count III.

### Conclusion

For the reasons given, plaintiffs' motion to strike (document no. 24) is granted and both motions to dismiss (document nos. 20 and 22) are denied.

**SO ORDERED.**

> FN1. In particular, plaintiffs contend that defendants impermissibly discuss StockerYale's shift from delivering prototype lasers to supplying production lasers, and argue that the press releases at issue were not false or misleading because they announced the start of regular shipments of production lasers-despite the absence of facts asserted in the complaint or text of the press releases to support such an argument.

> FN2. In paragraph 46 of the First Amended Complaint, plaintiffs characterize the April, 2004, transaction as "a small and financially immaterial order for 21 lasers worth about $200,000 pursuant to the old previously announced July 2002 contract with BAE Systems." However, the July, 2002, contract between StockerYale and BAE was for the sale of only seven lasers, the last of which were to be delivered by November 22, 2002.
> Moreover, while plaintiffs cite paragraph fifteen of a Securities and Exchange Commission ("SEC") complaint against StockerYale as the basis for their characterization of the April, 2004, transaction as a delivery pursuant to the July, 2002, contract, the SEC complaint actually refers to the April, 2004, transaction as part of a separate contract between BAE and StockerYale.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                    Page 16

--- F.Supp.2d ----, 2006 WL 2772581 (D.N.H.), 2006 DNH 109
(Cite as: — F.Supp.2d —–)

> FN3. Trading volume on April 20, 2004,
> was approximately 500 times greater than
> the average volume for the previous thirty
> days.

> FN4. The SEC first informed StockerYale
> of its investigation on August 6, 2004. On
> August 10, 2004, StockerYale issued a
> Form     8-K    disclosing     the     SEC's
> investigation into the two press releases.
> When the investigation was disclosed to
> the public, StockerYale shares reached a
> low of $0.84 in after-hours trading.

> FN5. Throughout this section, the term "
> defendants" is used to refer to StockerYale
> and Mark Blodgett.

D.N.H.,2006.
In re StockerYale
--- F.Supp.2d ----, 2006 WL 2772581 (D.N.H.),
2006 DNH 109

Briefs and Other Related Documents (Back to top)

• 2005 WL 2604986 (Trial Motion, Memorandum
and Affidavit) The Siregar Lead Plaintiff Group's
Reply Memorandum of Law to Defendants'
Opposition to the Motion for Appointment of Lead
Plaintiff and Lead Counsel (Aug. 18, 2005)
• 2005 WL 2604987 (Trial Motion, Memorandum
and Affidavit) The Siregar Lead Plaintiff Group's
Reply Memorandum of Law to Defendants'
Opposition to the Motion for Appointment of Lead
Plaintiff and Lead Counsel (Aug. 18, 2005)
• 2005 WL 1307951 (Trial Pleading) Class Action
Complaint for Violation of Securities Laws (May
25, 2005)
• 2005 WL 1539307 (Trial Pleading) Class Action
Complaint for Violation of Securities Laws (May
25, 2005)
• 1:05cv00177 (Docket) (May 25, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit B

Westlaw.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2006 WL 2587496 (D.Puerto Rico)
(Cite as: — F.Supp.2d —)

Briefs and Other Related Documents
Alvarado v. Morgan Stanley Dean Witter,
Inc.D.Puerto Rico,2006.Only the Westlaw citation
is currently available.
United States District Court,D. Puerto Rico.
Carlos ALVARADO, et al., Plaintiffs
v.
MORGAN STANLEY DEAN WITTER, INC., et
al., Defendants
No. CIV. 05-1149(JP).

Aug. 30, 2006.

**Background:** Investors brought securities fraud
action against investment firm, alleging that broker
sold them securities with intent to misappropriate
invested funds. Investment firm moved for
dismissal.

**Holdings:** The District Court, Pieras, Senior
District Judge, held that:

(1) investors stated claims for agency liability, and

(2) investors stated claims for controlling person
liability.

Motion denied.

**[1] Securities Regulation 349B** ☞**60.45(1)**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.43 Grounds of and Defenses
to Liability
                    349Bk60.45 Scienter, Intent,
Knowledge, Negligence or Recklessness
                        349Bk60.45(1) k. In General.

Most Cited Cases
To establish scienter, for purposes of securities
fraud claim under Securities Exchange Act of 1934,
plaintiff must show that defendant's conduct
evinced either conscious intent to commit alleged
fraud, or high degree of recklessness in connection
with fraud. Securities Exchange Act of 1934, §
10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[2] Securities Regulation 349B** ☞**60.47**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.43 Grounds of and Defenses
to Liability
                    349Bk60.47 k. Causation;
Existence of Injury. Most Cited Cases
To satisfy "loss" element of securities fraud claim
under Securities Exchange Act of 1934, plaintiff
must show both economic loss and loss causation,
i.e., causal connection between material
misrepresentation or omission and loss. Securities
Exchange Act of 1934, § 10(b), 15 U.S.C.A. §
78j(b); 17 C.F.R. § 240.10b-5.

**[3] Securities Regulation 349B** ☞**60.42**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.39 Persons Liable
                    349Bk60.42 k. Employers;
Respondeat Superior. Most Cited Cases
Agency liability was applicable to claim brought
under Securities Exchange Act of 1934 by investors
against investment firm, alleging that broker sold
them securities with intent to misappropriate
invested funds; statute provided for liability of firm
as "person" for acts of its agents within scope of
their apparent authority. Securities Exchange Act of
1934, §§ 3(a)(9), 10, 15 U.S.C.A. §§ 78c(a)(9), 78j.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                                            Page 2

--- F.Supp.2d ----, 2006 WL 2587496 (D.Puerto Rico)
**(Cite as: --- F.Supp.2d ----)**

**[4] Securities Regulation 349B ⬚➔60.40**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.39 Persons Liable
               349Bk60.40 k. In General; Control
Persons. Most Cited Cases
Investors who sued investment firm, alleging that
broker sold them securities with intent to
misappropriate invested funds, properly stated
claims for controlling person liability under
Securities Exchange Act of 1934; complaint averred
that firm had failed to supervise broker, and that
such failure had caused investors' damages.
Securities Exchange Act of 1934, § 20(a), 15
U.S.C.A. § 78t(a).

Alice Net-Carlo, Esq., Dorado, for Plaintiffs.
Heidi E. Rodríguez-Benítez, Esq., Néstor Méndez-G
ómez, Esq., Pietrantoni, Méndez & Alvarez, San
Juan, for Defendants.

### *OPINION AND ORDER*
PIERAS, Senior District Judge.
**\*1** The plaintiffs bring federal claims of securities
fraud against Morgan Stanley Dean Witter, alleging
that a Morgan Stanley broker sold them securities
with the intent to misappropriate the invested funds.
Morgan Stanley moves to dismiss the complaint on
the grounds that the plaintiffs failed to state a claim
under Sections 10(b) and 20(a) of the Securities
Exchange Act of 1934, and under Rule 10b-5,
promulgated by the Securities Exchange
Commission. The court denies the motion, and
holds that the plaintiffs stated claims for agency
liability under Section 10(b) and Rule 10b-5, and
for controlling person liability under Section 20(a).

### I. *FACTUAL ALLEGATIONS*

Carlos Soto was employed by Morgan Stanley as a
financial advisor and broker, and occupied the
position of First Vice President of Investments at
Morgan Stanley's San Juan branch. In 2001 the
plaintiffs, a married couple, followed Soto's advice

to invest in a GNMA fund through Morgan Stanley.
Soto told the plaintiffs the fund was a low risk
investment, and would yield an eight percent annual
return. He also told them the GNMA investment
account would activate a checking account at
Morgan Stanley, into which the couple could
deposit funds. The plaintiffs decided to chose to
invest in the GNMA fund, because of Morgan
Stanley's "good name and standing in the industry."
They assumed Soto was trustworthy, and that
Morgan Stanley carefully screened, and supervised
its brokers. The plaintiffs told Soto that the
investment was for the purpose of creating a college
fund for their daughters. On May 9, 2001, the
plaintiffs visited Soto at his office at Morgan
Stanley, and handed him a check for $1,015,000.00
made payable to Morgan Stanley. The plaintiffs
instructed Soto to invest $1,000,000.00 in the
GNMA fund, and to deposit the remaining
$15,000.00 in the checking account which would be
activated with the GNMA investment. Soto told the
plaintiffs that the interest earned on the GNMA
fund would be deposited into the checking account
each month, and that they would receive a receipt of
their investment by mail. The check was deposited
into a Morgan Stanley account at Bank of America.
The plaintiffs received by mail a document titled "
Statement of Your Account" with the Morgan
Stanley logo, which indicated they had invested
$1,000,000.00 in GNMA securities.

After the plaintiffs' made their investment, Soto
commingled the money deposited by the plaintiffs
with his own personal bank accounts and business
entities, and manipulated the Morgan Stanley
monthly statements to avoid detection. The
plaintiffs' monthly statements from Morgan Stanley
indicated that from September 13, 2002, until
February, 2004, they received monthly deposits into
their checking account in the amount of $4,777.53.
The monthly statements did not indicate what
persons or entities made deposits into the plaintiffs'
checking account, and the plaintiffs believed these
deposits represented interest on their GNMA
investment. However, at least once per month Soto
transferred funds from his personal accounts into
the plaintiffs' Morgan Stanley checking account in
order to cover the plaintiffs' expected interest
payment. Soto engaged in the same conduct with

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                              Page 3

--- F.Supp.2d ----, 2006 WL 2587496 (D.Puerto Rico)
**(Cite as: --- F.Supp.2d ----)**

other clients' accounts, and established an independent accounting system which indicated the amount of monies diverted from client accounts. His actions finally came to light on February 9, 2004, when he confessed to Morgan Stanley personnel that he had engaged in a scheme to divert Morgan Stanley investors' money for personal use and to engage in risky and speculative trading on his own behalf. Morgan Stanley eventually paid a $6 million fine levied by the New York Stock Exchange for their failures to supervise Soto, monitor customer accounts, and maintain accurate records.

**\*2** The plaintiffs allege Soto's and Morgan Stanley's actions caused them to lose over $650,000 in principal and interest on their GNMA investment, and also caused them to incur emotional damages. They claim Morgan Stanley is liable for securities fraud under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and under SEC Rule 10b-5, and for negligence, and breach of fiduciary duty under Article 1803 of the Puerto Rico Constitution.

### II. *ANALYSIS*

When considering a motion to dismiss, the district court must "assume the truth of all well-pleaded facts and indulge all reasonable inferences that fit the plaintiff's stated theory of liability." *In re Colonial Mortg. Bankers Corp.,* 324 F.3d 12, 15 (1st Cir.2003). The court is free to disregard "bald assertions, unsupportable conclusions, and opprobrious epithets." *In re Credit Suisse First Boston Corp.,* 431 F.3d 36, 45 (1st Cir.2005). In addition, a "complaint sufficiently raises a claim even if it points to no legal theory or even if it points to the wrong legal theory as a basis for that claim, as long as relief is possible under any set of facts that could be established consistent with the allegations." *González-Pérez v. Hospital Interamericano De Medicina Avanzada,* 355 F.3d 1, 5 (1st Cir.2004).

### A. *Section 10(b)*

**[1][2]** The elements of a claim under Section 10(b) are that the defendant (1) made a material misrepresentation or omission, (2) with scienter, (3) in connection with the purchase or sale of a security, (4) on which the plaintiff relied, (5) to his or her detriment. *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 341-342, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). To establish scienter a plaintiff must show that the defendant's conduct evinced either a conscious intent to commit the alleged fraud or a high degree of recklessness in connection with the fraud. *In re Credit Suisse First Boston Corp.,* 431 F.3d at 48 n. 5. To satisfy the final "loss" element, a plaintiff must show both economic loss and loss causation, *i.e.* a causal connection between the material misrepresentation or omission and the loss.

To survive a motion to dismiss a Section 10(b) complaint must satisfy the pleading standards of the Private Securities Litigation Reform Act (PSLRA). With respect to the element of scienter, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Where a plaintiff alleges the defendant omitted to state material facts necessary to make statements made not misleading, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The PSLRA's pleading standard is "congruent and consistent" with the First Circuit's pre-existing Rule 9(b) pleading standards. *In re Stone & Webster, Inc., Securities Litigation,* 414 F.3d 187, 195 (1st Cir.2005). Determining whether a complaint satisfies the PSLRA pleading requirements requires the court to perform "an individualized assessment that sweeps before it the totality of the facts in a given case." *In re Credit Suisse First Boston Corp.,* 431 F.3d at 46.

**\*3** The plaintiffs allege that Carlos Soto, while working as a broker and advisor for Morgan Stanley, sold them GNMA securities with the undisclosed intent to use the investment and the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                    Page 4

--- F.Supp.2d ----, 2006 WL 2587496 (D.Puerto Rico)
**(Cite as: --- F.Supp.2d ----)**

resulting income for his own purposes. In *SEC v. Zandford,* the Supreme Court held that when a broker sells securities with the secret intent to misappropriate the funds, the conduct constitutes fraud in connection with the purchase of securities in violation of Section 10(b). *SEC v. Zandford,* 535 U.S. 813, 820 122 S.Ct. 1899, 1903 (2002). Morgan Stanley concedes that the plaintiffs allege sufficient facts to state a Section 10(b) claim against Carlos Soto, under which they could recover if Soto were still a defendant in this case,[FN1] No. 20 at 8, but argues that it could not be held liable under Section 10(b) for the alleged material misrepresentations and omissions made by Carlos Soto.

The First Circuit adopted agency liability under Section 10(b) in *In re Atlantic Financial Management, Inc.,* 784 F.2d 29, 35 (1st Cir.1986), cert. denied, 481 U.S. 1072, 107 S.Ct. 2469, 95 L.Ed.2d 877 (1987). Under the First Circuit's decision in that case, a principal could be liable under Section 10(b) and Rule 10b-5 for actions within the agent's apparent authority. *Id.,* at 31-32. The court concluded that Section 20(a), 15 U.S.C. § 78t(a), which imposes joint and several liability on controlling persons, did not foreclose agency liability. *Id.,* at 32.

The issue before this court is whether the First Circuit's decision in *In re Atlantic Financial Management, Inc.* can survive an intervening Supreme Court decision. In *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 177, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), the Supreme Court held that private plaintiffs could not maintain aiding and abetting claims under Section 10(b) and Rule 10b-5. The Supreme Court reasoned that aiding and abetting another's fraud is outside the scope of conduct prohibited by Section 10(b), which only bars the making of a material misstatement or omission, and the commission of a manipulative act. *Id.,* at 177, 114 S.Ct. 1439. The court also stated that express causes of action in the 1933 and 1934 Acts did not provide for aiding and abetting liability, and that allowing aiding and abetting liability would impose liability where the element of reliance is not present. *Id.,* at 180, 114 S.Ct. 1439.

The court stated in *Central Bank* that imposition of control person liability under Section 20(a) indicated Congress did not intend to impose other forms of secondary liability,
Aiding and abetting is a method by which courts create secondary liability in persons other than the violator of the statute. The fact that Congress chose to impose some forms of secondary liability, but not others, indicates a deliberate congressional choice with which the courts should not interfere.

*Id.,* at 184, 114 S.Ct. 1439 (internal citation and quotation omitted). The dissenting justices stated that due to this language in the majority opinion, other forms of secondary liability "appear unlikely to survive the Court's decision." *Id.,* at 200 n. 12, 114 S.Ct. 1439 (Stevens, J., dissenting). The First Circuit has not ruled on the issue, but in a case arising under a state's blue sky laws cited the dissenting opinion, and stated that the *Central Bank* decision "cast[s] some doubt on *Atlantic Financial.*" *Dinco v. Dylex Limited,* 111 F.3d 964, 968 (1st Cir.1997).

**\*4 [3]** This court holds that agency liability under Section 10(b) survives *Central Bank.* The three Circuits that have ruled on the issue since *Central Bank* upheld Section 10(b) liability of principals for the acts of their agents within the scope of their apparent authority. *See Adams v. Kinder-Morgan, Inc.,* 340 F.3d 1083, 1107 (10th Cir.2003) (scienter of senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of Section 10(b) and Rule 10b-5 when those officers were acting within the scope of their apparent authority); *Suez Equity Investors, L.P. v. Toronto-Dominion Bank,* 250 F.3d 87, 100-101 (2d Cir.2001); *American Telephone and Telegraph Company v. Winback and Conserve Program, Inc.,* 42 F.3d 1421, 1432 (3d Cir.1994).

The *Central Bank* court was concerned with broadening the range of conduct that would give rise to liability under Rule 10b-5 beyond that proscribed by Section 10(b). The court held that when determining the elements for private causes of action under 10b-5, courts must look to the text of Section 10(b). *Id.,* at 178, 114 S.Ct. 1439. Further

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                    Page 5

--- F.Supp.2d ----, 2006 WL 2587496 (D.Puerto Rico)
**(Cite as: --- F.Supp.2d ----)**

inquiry is only necessary if the text does not resolve the issue, at which stage courts must infer "how the 1934 Congress would have addressed the issue had the 10b-5 action been included as an express provision in the 1934 Act," using as models the express causes of action in the securities acts. *Id.,* at 178, 114 S.Ct. 1439. The court determined that aiding and abetting liability would extend liability to those "who do not engage in the proscribed activities at all, but who give a degree of aid to those who do," *Id.,* at 176, and emphasized, "We cannot amend the statute to create liability for acts that are not themselves manipulative or deceptive within the meaning of the statute," *Id.,* at 277-278. The Congressional intent behind Section 20(a), the court stated, is one of several factors that would guide its analysis only if the language of Section 10(b) itself did not compel its decision. *Id.,* at 178 (" Because this case concerns the conduct prohibited by § 10(b), the statute itself resolves the case, but even if it did not, we would reach the same result.").

Like the issue of aiding and abetting liability, the issue of agency liability can be resolved with reference to the statute itself, without the need for further inquiry. Section 10(b) provides, "It shall be unlawful for *any person,* directly or indirectly, ... [t]o use or employ, in connection with the purchase or sale of any security... any manipulative or deceptive device." 15 U.S.C. § 78j (emphasis added). The 1934 Act, as amended, defines "person" as "a natural person, company, government, or political subdivision, agency, or instrumentality of a government." 15 U.S.C. § 78c(a)(9). In order for a company to be liable as a "person" under Section 10(b), agency liability must be recognized, because an entity can only act through its agents. *E.g. Business Guides, Inc. v. Chromatic Communications Enterprises, Inc.,* 498 U.S. 533, 548, 111 S.Ct. 922, 931, 112 L.Ed.2d 1140 (1991). Unlike courts imposing aiding and abetting liability, courts imposing liability on principals for the acts of their agents are not expanding the category of conduct proscribed by the relevant statute.

**\*5** The *Central Bank* court itself anticipated that despite the elimination of aiding and abetting liability, entities could still be liable under Section 10(b),

Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b-5, assuming *all* of the requirements for primary liability under Rule 10b-5 are met.

*Id.,* at 191 (emphasis in original), and that in many Section 10(b) cases there would be multiple violators. *Id.,* at 191.

After *Central Bank* the Supreme Court declined an opportunity to reject agency liability in *Wharf Holdings Limited v. United International Holdings, Inc.,* 532 U.S. 588, 121 S.Ct. 1776, 149 L.Ed.2d 845. In that case, Peter Woo, the chairman of Wharf Holdings, instructed Stephen Ng, a managing director, to negotiate a contract with United International Holdings. Ng informed Woo that United International Holdings wanted as part of the agreement an option to purchase shares of Wharf. Woo informed Ng that Wharf would not agree to the option. Ng defied his instructions and granted the option. The court implicitly assumed Ng's actions could be imputed to Wharf, and held that the sale of the option with the secret intent not to honor it violated Section 10(b) and Rule 10b-5. Given the opportunity to reject agency liability, as it rejected aiding and abetting liability, the Supreme Court declined to do so and affirmed liability of a corporate principal for the acts of its agent.[FN2]

The court rejects Morgan Stanley's argument that agency liability is no longer available under Section 10(b) and Rule 10b-5. Because Morgan Stanley makes no other arguments with respect to these claims, the defendant's motion to dismiss them is denied.

**B. *Section 20(a)***

Section 20(a) imposes liability on controlling persons for violations by the controlled person or entity. The established elements of Section 20(a) are (1) an underlying violation of the same chapter of securities laws by a controlled person, and (2) control of the primary violator by the defendant. *See*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                    Page 6

--- F.Supp.2d ----, 2006 WL 2587496 (D.Puerto Rico)
**(Cite as: --- F.Supp.2d ----)**

15 U.S.C. § 78t(a). Section 20(a) does not obligate plaintiffs to plead or prove scienter. *In re Stone & Webster, Inc., Securities Litigation,* 414 F.3d 187, 194 (1st Cir.2005). Rather, the defendant can rebut liability by proving that he or she "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." *See* 15 U.S.C. § 78t(a).

Morgan Stanley does not dispute that the plaintiffs pled sufficient facts to state a Section 20(a) claim with respect to the above mentioned elements, but argues the court should adopt the requirement that plaintiffs plead and prove "culpable participation" on the part of the controlling person. Some circuits have recognized this element. *See SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1472 (2d Cir.1996) (citing *Gordon v. Burr,* 506 F.2d 1080, 1085 (2d Cir.1974); *Rochez Bros., Inc. v. Rhoades,* 527 F.2d 880, 890 (3d Cir.1975). Other circuits have expressly rejected the element. *See Hollinger v. Titan Capital Corp.,* 914 F.2d 1564 (9th Cir.1990); *Harrison v. Dean Witter Reynolds, Inc.,* 79 F.3d 609, 614 (7th Cir.1996). On multiple occasions the First Circuit has declined to decide whether to adopt the "culpable participation" element. *See In re Stone & Webster, Inc., Securities Litigation,* 414 F.3d at 194, n. 4; *Aldridge v. A.T. Cross Corp.,* 284 F.3d 72, 85 (1st Cir.2002).

**\*6** [4] It is not necessary at this time to decide whether to adopt the requirement that the plaintiffs prove Morgan Stanley was a culpable participant, because even if such requirement existed, the plaintiffs sufficiently pled it. Section 20(a) provides that a "controlling person" is liable "unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78(t)(a). The seminal case adopting the "culpable participant" requirement, equates culpable participation with lack of good faith. *See Lanza v. Drexel & Co.,* 479 F.2d 1277, 1299 (2d Cir.1973). Courts that do not adopt the "culpable participant" element hold that good faith is an affirmative defense to liability under Section 20(a). *See e.g. Adams v. Kinder-Morgan, Inc.,* 340 F.3d at 1109, note 5. Good faith in this context requires a reasonable system of supervision, enforced with

reasonable diligence. *Harrison,* 79 F.3d at 615. In this case, the plaintiffs sufficiently alleged that Morgan Stanley failed to supervise Carlos Soto, and that its failure caused their damages. While adopting the "culpable participant" element would implicate burden of proof issues, the resolution of these issues is not necessary at this stage in the litigation. It suffices that relief is possible under a set of facts consistent with the factual allegations. Therefore, defendant's motion to dismiss the Section 20(a) claims is denied.

### III. *CONCLUSION*

The court denies Morgan Stanley's motion to dismiss the federal securities fraud claims primary liability under Section 10(b) and Rule 10b-5, and for controlling person liability under Section 20(a). Pursuant to Rule 12(a)(4)(A) of the Federal Rules of Civil Procedure Morgan Stanley must answer the complaint on or before ten days from entry of this order.

**IT IS SO ORDERED.**

> FN1. Claims against Carlos Soto and his wholly owned entities were voluntarily dismissed.

> FN2. It is worth noting that Justice Breyer, author of the opinion in *Wharf Holdings,* also wrote the First Circuit's decision in *In re Atlantic Financial Management, Inc.*

D.Puerto Rico,2006.
Alvarado v. Morgan Stanley Dean Witter, Inc.
--- F.Supp.2d ----, 2006 WL 2587496 (D.Puerto Rico)

Briefs and Other Related Documents (Back to top)

• 3:05cv01149 (Docket) (Feb. 7, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit C

**Westlaw.**

445 F.Supp.2d 170                                                     Page 1

445 F.Supp.2d 170, Fed. Sec. L. Rep. P 93,945
**(Cite as: 445 F.Supp.2d 170)**

Briefs and Other Related Documents
Rosenbaum Capital LLC v. Boston
Communications Group, Inc.D.Mass.,2006.
United States District Court,D. Massachusetts.
ROSENBAUM CAPITAL LLC, on behalf of itself
and all others similarly situated, Plaintiffs,
v.
BOSTON COMMUNICATIONS GROUP, INC.,
Karen A. Walker and Edward Y. Snowden,
Defendants.
**Civil Action No. 05-11165-WGY.**

Aug. 20, 2006.

**Background:** Investor brought securities fraud
action alleging that wireless telecommunications
provider and its directors made knowingly false
statements regarding patent infringement suit
against it. Defendants moved to dismiss complaint.

**Holdings:** The District Court, Young, J., held that:

(1) investor adequately pled that provider acted
with requisite scienter, and

(2) provider's public statements regarding
infringement action were sufficient material.

Motion denied.
West Headnotes
**[1] Securities Regulation 349B ⬤══60.18**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
           349Bk60.17 Manipulative, Deceptive
or Fraudulent Conduct
              349Bk60.18 k. In General. Most
Cited Cases

Elements of securities fraud claim are: (1) material
misrepresentation or omission; (2) scienter; (3)
connection with purchase or sale of security; (4)
reliance; (5) economic loss; and (6) loss causation.
Securities Exchange Act of 1934, § 10(b), 15
U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[2] Securities Regulation 349B ⬤══60.45(1)**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
           349Bk60.43 Grounds of and Defenses
to Liability
             349Bk60.45 Scienter, Intent,
Knowledge, Negligence or Recklessness
               349Bk60.45(1) k. In General.
Most Cited Cases
Plaintiff asserting securities fraud claim must plead
mental state embracing intent to deceive,
manipulate, or defraud. Securities Exchange Act of
1934, §§ 10(b), 21D(b)(2), 15 U.S.C.A. §§ 78j(b),
78u-4(b)(2); 17 C.F.R. § 240.10b-5.

**[3] Securities Regulation 349B ⬤══60.53**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
           349Bk60.50 Pleading
             349Bk60.53 k. Misrepresentation.
Most Cited Cases
If plaintiff asserting securities fraud claim
adequately pleads that statement of opinion was
subjectively false when made, complaint will, ex
proprio vigure, satisfy pleading requirements of
Private Securities Litigation Reform Act (PSLRA)
relative to scienter. Securities Exchange Act of
1934, §§ 10(b), 21D(b)(2), 15 U.S.C.A. §§ 78j(b),
78u-4(b)(2); 17 C.F.R. § 240.10b-5.

**[4] Securities Regulation 349B ⬤══60.45(1)**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

445 F.Supp.2d 170

445 F.Supp.2d 170, Fed. Sec. L. Rep. P 93,945
**(Cite as: 445 F.Supp.2d 170)**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.43 Grounds of and Defenses to Liability
                349Bk60.45 Scienter, Intent, Knowledge, Negligence or Recklessness
                349Bk60.45(1) k. In General. Most Cited Cases
To plead scienter sufficiently in securities fraud action, there must be allegations that defendant's conduct evinced either conscious intent to commit alleged fraud or high degree of recklessness in connection with fraud. Securities Exchange Act of 1934, §§ 10(b), 21D(b)(2), 15 U.S.C.A. §§ 78j(b), 78u-4(b)(2); 17 C.F.R. § 240.10b-5.

**[5] Securities Regulation 349B ⇐60.45(1)**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.43 Grounds of and Defenses to Liability
                349Bk60.45 Scienter, Intent, Knowledge, Negligence or Recklessness
                349Bk60.45(1) k. In General. Most Cited Cases
Investor adequately pled that company acted with requisite scienter to support securities fraud claim when it made public statements about potential outcome of pending patent infringement litigation against it, where investor alleged that company hired experts to draft variation of its allegedly infringing device, with additional unnecessary components, so that it would appear to be different from patented system, that it sought legal opinions that were neither thorough nor based on review and analysis of relevant factors for use as shield against claims of willful infringement, and that jury entered verdict of willful infringement. Securities Exchange Act of 1934, §§ 10(b), 21D(b)(2), 15 U.S.C.A. §§ 78j(b), 78u-4(b)(2); 17 C.F.R. § 240.10b-5.

**[6] Securities Regulation 349B ⇐60.27(7)**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.17 Manipulative, Deceptive or Fraudulent Conduct
                349Bk60.27 Misrepresentation
                349Bk60.27(7) k. Statements in the Media, Press Releases and Financial Reporting Services. Most Cited Cases

**Securities Regulation 349B ⇐60.46**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.43 Grounds of and Defenses to Liability
                349Bk60.46 k. Materiality of Violation. Most Cited Cases
Wireless telecommunications provider's public statements that it did not infringe competitor's patents and that it had meritorious defenses in pending patent infringement suit were sufficiently material to support investor's securities fraud claim against provider, despite provider's contention that statements were mere puffery or forward-looking statements, where provider's infringement was found by jury to have been willful, statements were specific, and provider did not give any warning, other than boilerplate disclaimers, to dissuade investors from giving credence to them. Securities Exchange Act of 1934, §§ 10(b), 21D(b)(2), 15 U.S.C.A. §§ 78j(b), 78u-4(b)(2); 17 C.F.R. § 240.10b-5.

**\*171** David Pastor, Gilman and Pastor, LLP, Boston, MA, Paulette S. Fox, Peter C. Harrar, Wolf, Haldenstein, Adler, Freeman & Herz, LLP, New York City, for Plaintiffs.
Samuel Lieberman, Wilmer Cutler Pickering Hale and Dorr LLP, New York City, Clark W. Petschek, Wilmer Cutler Pickering Hale and Dorr LLP, Boston, MA, for Defendants.

**\*172** *MEMORANDUM AND ORDER*
YOUNG, District Judge.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

445 F.Supp.2d 170                                                                                                         Page 3

445 F.Supp.2d 170, Fed. Sec. L. Rep. P 93,945
(Cite as: 445 F.Supp.2d 170)

## I. INTRODUCTION

In this action, the plaintiff Rosenbaum Capital LLC ( "Rosenbaum") accuses the defendants Boston Communications Group, Inc. ("Boston Communications") and two of its directors (collectively, the "defendants") of making knowingly false statements regarding certain litigation in which the defendants were involved. Rosenbaum alleges that these statements were in violation of (1) Section 10(b) of the Securities Exchange Act of 1934; (2) Rule 10b-5 promulgated thereunder; and (3) Section 20(b) of the Securities Exchange Act. The defendants have moved for dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## II. ALLEGATIONS OF THE COMPLAINT

In the early 1990s, Douglas Fougnies ("Fougnies"), a cellular telephone marketer, and Dan Harned (" Harned"), an engineer, conceived and developed a system which enabled wireless telephone users to prepay for service. Am. Compl. [Doc. No. 19] ¶ 28. Fougnies and Harned (collectively, the " inventors") were granted two patents in connection with their invention, *id.* ¶ 34, and assigned their individual rights to the patents to Freedom Wireless, Inc. ("Freedom Wireless"), *id.* ¶ 35.

Freedom Wireless expanded quickly and soon began to license the patents to other companies. *Id.* ¶ 39-40. By 1996, however, Freedom Wireless could not obtain the necessary "private connections" from wireless providers *id.* ¶ 41, because such wireless providers, *e.g.,* Verizon Wireless, Inc. and Boston Communications, had begun selling services of their own that competed with those of Freedom Wireless. *Id.* ¶ 42. The competing services allowed cellular phone companies to sell their prepaid minutes directly to customers, instead of Freedom Wireless-effectively cutting out the " middleman" position Freedom Wireless once enjoyed. *Id.*

Boston Communications' prepaid system (the "c2c system") performed the same function, in the same manner, and with the same results as that of

Freedom Wireless. *Id.* ¶ 44. As soon as the inventors were awarded their first patent, they sent Boston Communications a letter (the "notice letter") notifying Boston Communications that it was infringing and stating that, if Boston Communications wanted to continue using the technology, it would have to obtain a license from Freedom Wireless. *Id.* ¶ 46.

After receiving the notice letter, Boston Communications hired experts to draft a new c2c system with additional, unnecessary components in order to make the new system appear different from that of Freedom Wireless. *Id.* Moreover, Boston Communications attempted (unsuccessfully) to gain the rights to the Freedom Wireless patents by entering into a $750,000 licensing agreement with Orbital Sciences, which had employed Harned when he had co-invented the patented technology. *Id.* ¶ 47 Furthermore, Boston Communications obtained opinion letters from law firms which would bolster a defense against willful infringement claims. *Id.* ¶ 48. Boston Communications knew, however, that these letters were "neither thorough nor based on a review and analysis of Freedom's actual patent, defendants' systems, the prosecution history, the applicable law, or other relevant factors. Instead these legal opinion letters were superficial and conclusory." *Id.*

On May 20, 2005, after a lengthy jury trial, Boston Communications was found liable for the willful infringement of Freedom Wireless's patents. *Id.* ¶ 50. The *173 jury awarded $128,000,000 in damages. *Id.* ¶ 51. Judge Harrington did not award attorneys' fees because, in "the [c]ourt's judgment[,] ... the jury verdict constitute[d] a fair, reasonable and just compensation for such willful infringement of said patents." *See* Decl. of Clark W. Petschek ("Clark Decl.") [Doc. No. 24], Ex. 6; Order re Mot. for Att'ys Fees and Enhanced Damages [Doc. No. 1931], Oct. 13, 2005, *Freedom Wireless, Inc. v. Boston Communications Group, Inc.,* No. 00-12234 (D. Mass. filed Oct. 30, 2000).

In the instant action, Rosenbaum alleges that several statements made by Boston Communications during the course of the Freedom Wireless litigation are actionable as fraud.[FN1] These statements (or

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

445 F.Supp.2d 170

445 F.Supp.2d 170, Fed. Sec. L. Rep. P 93,945
(Cite as: 445 F.Supp.2d 170)

versions of them) were made repeatedly during the class period in various conference calls with analysts or in SEC filings:

> FN1. Rosenbaum alleges several statements prior to the class period-June 6, 2002, to May 20, 2005. Am. Compl. ¶¶ 1, 54-56. As such, these statements are not actionable. *See Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1217 n. 31 (1st Cir.1996) ("We limit our analysis of the [ ] plaintiffs' claims of affirmative misrepresentation to the statements allegedly made by defendants within the Class Period." (citing *In re Clearly Canadian Secs. Litig.,* 875 F.Supp. 1410, 1420 (N.D.Cal.1995) (striking from the complaint alleged statements outside the class period))).

"[Boston Communications] does not believe that it infringes these patents and believes that it has meritorious defenses to the action." *Id.* ¶¶ 59, 61, 63, 66, 73; *See id.* ¶¶ 58, 76.
"[Boston Communications] do[es] not believe that we infringe these patents and believe[s] that the patents are invalid in light of prior art and other reasons." *Id.* ¶¶ 69, 71, 74, 75, 77, 79, 80 *See id.* ¶¶ 60, 62, 64, 65, 67, 68, 70, 72, 78.

Rosenbaum alleges that, at the time of these statements, Boston Communications itself did not believe them-*i.e.,* Boston Communications knew that it was infringing Freedom Wireless's valid patents. *See* Am. Compl. ¶¶ 89-91. In light of the rest of Boston Communications' actions at the time, claims Rosenbaum, its statements were fraudulently inaccurate and incomplete-and materially so. *See id.* Rosenbaum has pleaded sufficiently to survive the defendants' motion to dismiss.

### III. LEGAL STANDARDS

[1] The elements of a securities fraud claim are: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale

of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 341, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). On a motion to dismiss, of course, a court must accept as true all well-pleaded allegations in the complaint and must draw all reasonable inferences in the plaintiff's favor. *Cooperman v. Individual, Inc.,* 171 F.3d 43, 46 (1st Cir.1999).

Though Rule 8 of the Federal Rules of Civil Procedure provides only that a "short and plain statement of the claim" need be pleaded, Rule 9(b) requires that the circumstances supporting "all averments of fraud ... be stated with particularity," Fed.R.Civ.P. 9(b). Congruent with the Private Securities Litigation Reform Act of 1995 ("PSLRA" ), 15 U.S.C. § 78u-4(b), the First Circuit "has been notably strict and rigorous in applying the Rule 9(b) standard in securities fraud actions." *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 193 (1st Cir.1999). Under this standard, "a securities fraud complaint must 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an *174 allegation regarding the statement is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.' " *In re Cableton Sys., Inc.,* 311 F.3d 11, 27 (1st Cir.2002) (quoting 15 U.S.C. § 78u-4(b)(1)).

[2] As for scienter, the plaintiff must plead "a mental state embracing [an] intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The PSLRA requires a plaintiff to allege facts which "giv[e] rise to a *strong inference* that the defendant acted" with scienter. 15 U.S.C. § 78u-4(b)(2) (emphasis added).

### IV. DISCUSSION

Boston Communications attacks the sufficiency of Rosenbaum's allegations on two main grounds: (1) Rosenbaum's allegations of scienter are insufficient; and (2) the statements at issue are not material or incomplete, but rather are mere corporate puffery (at worst) or are protected, in any event, as

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

445 F.Supp.2d 170                                                                                                    Page 5

445 F.Supp.2d 170, Fed. Sec. L. Rep. P 93,945
**(Cite as: 445 F.Supp.2d 170)**

forward-looking. Def. Mem. In Support of Mot. to Dismiss ("Def.Mem.") [Doc. No. 23] at 9, 14. Both parties cite *In re SeaChange Int'l, Inc.,* No. Civ.A. 02-12116-DPW, 2004 WL 240317 (D.Mass. Feb. 6, 2004) (Woodlock, J.), as counseling an outcome in their favor. Def. Mem. at 15-16; Pl. Opp'n to Def. Mot. to Dismiss ("Pl.Opp'n") [Doc. No. 26] at 17-18.

As here, *In re SeaChange* involved claims that the defendant SeaChange International, Inc. (" SeaChange") had made materially false and misleading statements about the potential outcome of pending patent infringement litigation. 2004 WL 240317 at *7. The allegedly false statement in *SeaChange* read as follows:
We responded on January 26, 2001, denying the claim of infringement....
We cannot be certain of the outcome of the foregoing litigation, but do plan to oppose the allegations against us and assert our claims against the other parties vigorously. [W]e are unable to estimate the impact to our business, financial condition and results of operations or cash flows.

*Id.* After ruling that the requisite scienter could be inferred from the jury having found willful infringement and the trial judge's grant of attorneys' fees, *id.* at *7-8, Judge Woodlock turned to whether the statement was "complete and accurate", given that SeaChange knew that it was infringing:The information provided in the Prospectus was accurate, even considering knowledge of the patent infringing conduct. While the information may have been, in some predictive sense, incomplete, I find that, given the well understood vagaries of litigation, it was not so incomplete as to mislead investors.

*Id.* at *9. Judge Woodlock noted that, when disclosing material information, a company owes a duty to "keep the information from being materially misleading" by providing a complete and accurate picture of that information. *Id.* at *8. SeaChange, however, had not made any representations suggesting it would win and thus was not inaccurate.The Prospectus stated that SeaChange was contesting [the plaintiff's] claim of patent infringement, that it was not certain what the

outcome of the litigation would be, and that it could not "estimate the impact" of the litigation. It contained no statements suggesting that SeaChange would prevail in the litigation or implying that the impact of the litigation would be positive.

*Id.* Judge Woodlock accordingly allowed SeaChange's motion to dismiss. *Id.* at *16.

**\*175** The present case is both similar to and distinguishable from *In re SeaChange*-and in each respect the analysis is not beneficial to Boston Communications.

### A. Scienter

As in *SeaChange,* this Court is presented with a prior jury verdict finding of willful infringement. Judge Woodlock had used such a verdict to infer fraudulent intent.<sup>FN2</sup> *Id.* at *8. Although in the instant case there was no additional award of attorneys' fees in the previous litigation-unlike in *SeaChange*-the absence of such an award was not the result of a ruling that minimized or disturbed the jury's finding of willfulness.

> FN2. A finding of willful infringement, by itself, is not sufficient to be *res judicata* on the issue of fraudulent intent. *See In re SeaChange,* 2004 WL 240317, at *8 (" Willfulness in the context of patent infringement is not equivalent to actual knowledge."); *see also Ferguson Beauregard/Logic Controls v. Mega Sys., Inc.,* 350 F.3d 1327, 1343 (Fed.Cir.2003) (ruling that willful infringement "does not equate to fraud" and is therefore not subject to the more stringent 9(b) pleading requirements).

[3][4][5] Furthermore, Rosenbaum alleges other facts which sufficiently support an inference of fraudulent intent. "[I]f a plaintiff adequately pleads that a statement of opinion was subjectively false when made, the complaint will, ex proprio vigure, satisfy the pleading requirements of the PSLRA relative to scienter." *In re Credit Suisse First*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

445 F.Supp.2d 170, Fed. Sec. L. Rep. P 93,945
**(Cite as: 445 F.Supp.2d 170)**

*Boston Corp.,* 431 F.3d 36, 48 (1st Cir.2005). To plead scienter sufficiently, there must be allegations that "the defendant's conduct evinced either a conscious intent to commit the alleged fraud or a high degree of recklessness in connection with the fraud." *Id.* at 48 n. 5. Among other conduct, Rosenbaum alleges that Boston Communications " hired experts to draft a variation of its c2c system, with additional *unnecessary* components, merely so that it would *appear* to be different from Freedom[ Wireless's] now patented system." Am. Compl. ¶ 46 (emphasis added). In addition, Rosenbaum alleges that Boston Communications sought "legal opinions [which] were neither thorough nor based on a review and analysis of Freedom [Wireless's] actual patent, defendants' systems, the prosecution history, the applicable law, or other relevant factors . .. for use as a shield against claims of willful infringement." *Id.* ¶ 48. These allegations, in conjunction with the jury verdict finding of willful infringement, are sufficient to raise a "strong inference" that Boston Communications' statements were knowingly false when made and, thus, exhibit fraudulent intent. *See In re Credit Suisse,* 431 F.3d at 49 ("[T]he plaintiff must, for each allegedly false opinion, plead provable facts strongly suggesting that the speaker did not believe that particular opinion to be true when uttered.").

**B. Materiality**

Regarding the statements themselves, unlike in *SeaChange,* Boston Communications made substantive declarations regarding its beliefs about the merits of the Freedom Wireless litigation. Specifically, Boston Communications affirmatively claimed that it did not infringe the patents and that it had meritorious defenses, namely that the patents were invalid based on prior art. *Cf. SeaChange,* 2004 WL 240317, at *8 ("[Neutral representations in the prospectus] *contained no statements suggesting that SeaChange would prevail* in the litigation or implying that the impact of the litigation on the company would be positive." (emphasis added)).

[6] "When a corporation does make a disclosure-whether it be voluntary or required*176

-there is a duty to make it complete and accurate." *Roeder v. Alpha Indus., Inc.,* 814 F.2d 22, 26 (1st Cir.1987). In addition, a company's statements, once made, must not be "so incomplete as to mislead." *Backman v. Polaroid Corp.,* 910 F.2d 10, 16 (1st Cir.1990). Assuming, as alleged, that Boston Communications' statements of belief were knowingly false when made, they are inaccurate by definition. Moreover, not disclosing the steps Boston Communications allegedly took in order to hide its willful infringement renders the statements misleadingly incomplete. *Cf. In re Amylin Pharms., Inc. Secs. Litig.,* No. 01CV1455 BTM (NLS), 2003 WL 21500525, at *8 n. 3 (S.D.Cal. May 1, 2003) ("If a defendant states that it believes or expects that the FDA will approve its drug but has information tending to seriously undermine the accuracy of its statement, the statement is actionable. ").

Even if all of this is so, argues Boston Communications, the statements are not material, amounting merely to corporate puffery or, in the alternative, are forward-looking statements protected by law. Def. Mem. at 9-12. The Court does not agree. A misrepresentation or omission is material when a reasonable investor would have viewed it as "having significantly altered the total mix of information made available." *Basic, Inc. v. Levinson,* 485 U.S. 224, 231-32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). Generally, "disputes over the materiality of allegedly false or misleading statements must be reserved for the trier of fact"; statements constituting "corporate puffery," however, are immaterial as matter of law. *Shaw,* 82 F.3d at 1217, 1218-19.
[C]ourts have demonstrated a willingness to find immaterial as a matter of law certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace-loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available.

*Id.* at 1217.

The statements allegedly made by Boston

445 F.Supp.2d 170                                                                                   Page 7

445 F.Supp.2d 170, Fed. Sec. L. Rep. P 93,945
**(Cite as: 445 F.Supp.2d 170)**

Communications were not vague. Nor were they unclear. Moreover, they were quite specific. Boston Communications' statements indicated the company's (allegedly false) belief (1) that it did not infringe on the Freedom Wireless patents; (2) that it had a meritorious defense; and (3) that the Freedom Wireless patents were invalid. A company's own assessment regarding the outcome of litigation in which it is involved would certainly " alter the total mix of information" for a reasonable investor and is not merely a "rosy affirmation".

These statements, moreover, were not tempered by warnings sufficient as matter of law to dissuade investors from giving credence to them. The only such warning relevant to the *outcome* of the Freedom Wireless litigation was a generic one: " From time to time, as a normal incidence of the nature of [Boston Communications'] business, various claims, charges and litigation are asserted or commenced against us arising from, or related to, contractual matters, patents, trademarks, personal injury, and personnel and employment disputes. As to such claims and litigation, we can give no assurance that we will prevail." *See, e.g.,* Clark Decl., Ex. 1; Def. Allegedly Fraudulent Class Period Statements at 2. Other warnings related only to the potential consequences of Boston Communications losing the Freedom Wireless litigation. *See id.* at 1 ("[Boston Communications] has an obligation to indemnify the other defendants for the damages they may incur with respect to any infringement."); *id.* at 2 ("There can be **\*177** no assurances that [Boston Communications'] expenses to defend the Freedom Wireless suit will not exceed the Company's estimate. If [Boston Communications] is found to infringe on the Freedom Wireless patent ... [Boston Communications'] business, financial condition and results of operations would be materially adversely affected."). Warnings such as these are insufficient to render immaterial Boston Communications' otherwise material statements regarding the outcome of the Freedom Wireless litigation or to paint them as puffery as matter of law.

For the same reason, Boston Communications' statements are actionable despite the safe-harbor provisions of the PSLRA for forward-looking

statements [FN3] or the "bespeaks caution" doctrine. Both require that such statements be "be accompanied by meaningful cautionary statements". *See* 15 U.S.C. § 78u-5(c)(1)(A)(i) (setting out the PSLRA's standards); *Shaw,* 82 F.3d at 1213 (describing the "bespeaks caution" doctrine). " Vague or boilerplate disclaimers are insufficient to invoke safe harbor protection." *In re Sepracor, Inc. Secs. Litig.,* 308 F.Supp.2d 20, 34 (D.Mass.2004) (Lasker, J.) (internal quotation marks omitted). As discussed above, the warnings issued by Boston Communications are insufficient to offer safe harbor to its otherwise material statements.

> FN3. As a matter of strict grammar, Boston Communications' statements speak to *present* belief. The Court does not resolve whether such statements might nevertheless qualify as forward-looking under the law. If any statements can so qualify, however, one would imagine that present statements of belief regarding the probability of future events, such as these, would meet the test.

### V. CONCLUSION

Accordingly, the defendants' Motion to Dismiss [Doc. No. 22] is DENIED.

SO ORDERED.

D.Mass.,2006.
Rosenbaum Capital LLC v. Boston Communications Group, Inc.
445 F.Supp.2d 170, Fed. Sec. L. Rep. P 93,945

Briefs and Other Related Documents (Back to top)

• 2006 WL 1084901 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of Defendants' Motion to Dismiss Amended Class Action Complaint (Feb. 10, 2006) Original Image of this Document (PDF)
• 2006 WL 360786 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

445 F.Supp.2d 170                                                                                           Page 8

445 F.Supp.2d 170, Fed. Sec. L. Rep. P 93,945
**(Cite as: 445 F.Supp.2d 170)**

Amended Class Action Complaint (Jan. 13, 2006)
Original Image of this Document (PDF)
• 2005 WL 3173470 (Trial Pleading) Amended
Class Action Complaint for Violations of Federal
Securities Law (Oct. 12, 2005) Original Image of
this Document (PDF)
• 2005 WL 1925483 (Trial Pleading) Class Action
Complaint for Violations of Federal Securities Laws
(Jun. 6, 2005) Original Image of this Document
(PDF)
• 1:05cv11165 (Docket) (Jun. 6, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.